# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

PEOPLE v EADS

Docket No. 168205. Argued April 8, 2026 (Calendar No. 2). Decided July 30, 2026.

James G. Eads was convicted following a jury trial in the Wayne Circuit Court of second-degree murder, MCL 750.317, and felony-firearm, MCL 750.227b. Defendant was 16 years old when he shot and killed a 17-year-old in an apparently gang-related incident in 1992. Defendant had been riding in the backseat of a car when he noticed the 17-year-old wearing a T-shirt representing a rival street gang. Defendant exited the car, drew a pistol, and shot the victim five times. While defendant was charged with first-degree murder, MCL 750.316, the jury convicted defendant of the lesser included offense of second-degree murder. The advisory judicial sentencing guidelines in effect at the time recommended a minimum sentence between 12 and 25 years' imprisonment or parolable life imprisonment. The trial court, John H. Hausner, J., sentenced defendant as an adult and imposed a sentence of 50 to 75 years' imprisonment, which was to be served consecutively to a term of two years' imprisonment for felony-firearm. In his direct appeal, defendant argued that his sentence was disproportionate under *People v Milbourn*, 435 Mich 630 (1990). The Court of Appeals affirmed in an unpublished per curiam opinion, issued November 9, 1994 (Docket No. 160735). Defendant sought leave to appeal in the Supreme Court, and the Supreme Court denied leave to appeal. 450 Mich 865 (1995).

In January 2021, defendant moved for relief from judgment under MCR Subchapter 6.500, challenging his sentence of 50 to 75 years' imprisonment as unconstitutional and disproportionate in light of *Miller v Alabama*, 567 US 460 (2012), and its progeny. Defendant argued that the trial court violated the Eighth Amendment and his due-process rights by imposing a disproportionate sentence that failed to properly consider his youth as a mitigating factor under *Miller* and that his constitutional right to equal protection was violated because he was being treated more harshly than a juvenile convicted of first-degree murder and sentenced to a term-of-years sentence under MCL 769.25 or MCL 769.25a. The trial court, Mark T. Slavens, J., denied defendant's motion. The Court of Appeals denied defendant's application for leave to appeal in an unpublished order, entered July 19, 2021 (Docket No. 357332). Defendant sought leave to appeal in the Supreme Court. While defendant's application remained pending, the Supreme Court issued opinions in *People v Stovall*, 510 Mich 301 (2022), which held that a parolable life sentence imposed on a juvenile convicted of second-degree murder violates Michigan's constitutional prohibition on cruel or unusual punishment, and *People v Boykin*, 510 Mich 171 (2022), which held that a court resentencing a juvenile convicted of first-degree murder to a term-of-years sentence under MCL

769.25 or MCL 769.25a must consider the distinctive attributes of youth as mitigating factors but need not articulate on the record how the defendant's youth affected the sentence imposed.

After those opinions were issued, the Supreme Court remanded this case to the Court of Appeals for consideration as on leave granted, directing the Court of Appeals to consider whether defendant is entitled to relief under *Boykin* or *Stovall*. 512 Mich 918 (2023). On remand, the Court of Appeals, BORRELLO and MARIANI, JJ. (MURRAY, P.J., dissenting), held that defendant was entitled to resentencing. The Court of Appeals majority concluded that defendant's motion satisfied the procedural requirements in MCR 6.508(D) because defendant's direct appeal was completed long before *Miller* and its progeny were issued. On the merits, the majority analyzed defendant's sentence under Const 1963, art 1, § 16 and the four-factor test from *People v Bullock*, 440 Mich 15 (1992). The majority concluded that the sentence was cruel or unusual punishment under these factors for reasons similar to those articulated in *Stovall* when holding that a parolable life sentence constituted cruel or unusual punishment, and the majority held that defendant's sentence was also disproportionate under the related, but distinct, nonconstitutional proportionality requirement in *Milbourn* and *Boykin*. The prosecution sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. ___ Mich ___; 25 NW3d 118 (2025).

In an opinion by Justice THOMAS, joined by Chief Justice CAVANAGH and Justices BERNSTEIN, WELCH, BOLDEN, and HOOD, the Supreme Court *held*:

A sentence of 50 to 75 years' imprisonment for second-degree murder committed by a youthful offender violates the prohibition on cruel or unusual punishment under Const 1963, art 1, § 16. This holding applies retroactively to cases on collateral review.

1. Defendant demonstrated good cause for failing to raise a constitutional challenge to his sentence on direct appeal. While defendant challenged his sentence on nonconstitutional *Milbourn* proportionality grounds in his direct appeal, he did not argue in that appeal that his sentence constituted cruel or unusual punishment under Const 1963, art 1, § 16. Under MCR 6.508(D)(3)(a) and (b), to obtain relief on the basis of grounds that could have been raised in a prior proceeding but were not, a defendant must demonstrate good cause for failure to raise such grounds on appeal as well as actual prejudice. The Supreme Court has consistently recognized as good cause an intervening retroactive constitutional decision relevant to the defendant's claims, and defendant's direct appeal in this case was exhausted in 1995, long before *Miller*, *Stovall*, and other retroactive changes in constitutional law regarding youth sentencing were decided. Additionally, defendant could show actual prejudice under MCR 6.508(D)(3)(b)(*iv*) because his sentence, which constituted cruel or unusual punishment under Michigan's Constitution, was invalid.

2. Defendant's discretionary term-of-years sentence was appropriately assessed under Const 1963, art 1, § 16 and the *Bullock* factors. While both Const 1963, art 1, § 16 and *Milbourn* require that sentences be proportionate, they do so under different frameworks that reflect different focuses and rationales. *Milbourn* proportionality review is a product of the legislative intent for proportionality in sentencing by granting a trial court discretion to impose a sentence within a particular range; thus, the focus of the *Milbourn* inquiry is whether a sentence imposed is proportionate under this framework. And because the statutory scheme provides a trial court with

the discretion to select a sentence within a particular range, appellate review is under a deferential abuse-of-discretion standard.

In contrast, Const 1963, art 1, § 16 provides a *check* on the Legislature's authority to authorize punishment. This necessarily requires an exercise of independent judicial judgment that is informed by considerations outside of legislative intent. Moreover, it is axiomatic that a sentencing judge lacks discretion to impose an unconstitutional sentence. Thus, unlike *Milbourn* proportionality review, appellate courts review de novo whether a sentence violates Const 1963, art 1, § 16. Finally, while *Milbourn* proportionality is a highly fact-specific inquiry that is based on the particular circumstances of an offense and offender, the cruel-or-unusual-punishment clause is often applied to an entire class of offenders subject to a particular punishment. A sentence might be considered reasonable when viewed in the context of the Michigan legislative scheme yet be considered disproportionate under Const 1963, art 1, § 16. It is also possible that a punishment is categorically cruel or unusual as a matter of law when applied to a particular class of offenders such that it is unnecessary to engage in a more fact-specific *Milbourn* proportionality review. It would be inappropriate to interpret a doctrine premised on legislative intent as cutting off an independent constitutional analysis that, by its nature, serves as a limitation on the Legislature's authority.

3. A sentence of 50 to 75 years' imprisonment for second-degree murder committed by a youthful offender violates the prohibition on cruel or unusual punishment under Const 1963, art 1, § 16. In assessing whether a punishment is cruel or unusual in violation of Const 1963, art 1, § 16, a court considers the following factors articulated in *Bullock*: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation. In this case, every *Bullock* factor supports the conclusion that defendant's sentence is unconstitutionally excessive. With regard to the first two factors, a sentence of 50 to 75 years' imprisonment, like the parolable life sentence analyzed in *Stovall*, exceeds what is presumptively imposed on a youthful offender for the more serious offense of first-degree murder, without the benefit of the procedural protections that are provided to a youthful offender convicted of first-degree murder. Such a sentence means that the initial review by the parole board does not occur until after a defendant has served 50 years in prison, after which an individual's opportunity for release is contingent on the parole board's discretion for the remainder of their lifetime. As to the third factor, a sentence of 50 to 75 years' imprisonment for second-degree murder committed by a youthful offender is out of step with national trends regarding youth sentencing and with the types of sentences other jurisdictions typically impose on anyone convicted of second-degree murder. Finally, this sentence does not meaningfully advance the penological goal of rehabilitation.

4. Because defendant's sentence is categorically unconstitutional as applied to a youthful offender convicted of second-degree murder, it was unnecessary to address whether, under the specific facts of this case, defendant would also be entitled to relief under *Milbourn* and *Boykin*; accordingly, Part VI of the Court of Appeals opinion, which addressed whether defendant was entitled to resentencing under *Milbourn* and *Boykin*, is vacated, and Part III of the Court of Appeals opinion is vacated to the extent that it addresses whether defendant was procedurally barred by MCR 6.508(D)(2) from raising challenges to his sentence under *Milbourn* and *Boykin*.

5. The holding in this case—that a sentence of 50 to 75 years' imprisonment for a second-degree murder committed by a youthful offender violates Const 1963, art 1, § 16—applies retroactively to cases on collateral review.

Court of Appeals' judgment affirmed to the extent that it reverses the Wayne Circuit Court's order denying defendant's motion for relief from judgment, vacates defendant's sentence for second-degree murder, and remands this case to the Wayne Circuit Court for resentencing; Part III of the Court of Appeals opinion vacated to the extent it addresses whether defendant was procedurally barred by MCR 6.508(D)(2) from raising challenges to his sentence under *Milbourn* and *Boykin*; and Part VI of the Court of Appeals opinion vacated.

Justice ZAHRA, dissenting, would have held that defendant's case is procedurally barred and that defendant's term-of-years sentence is not unconstitutionally cruel or unusual. Defendant did not argue in his motion for relief from judgment that his sentence is categorically unconstitutional; defendant argued that his sentence violates the principles of equal protection and that the trial court failed to consider the mitigating characteristics of youth. Defendant's argument that his sentence is cruel or unusual under the Michigan Constitution is procedurally barred by MCR 6.508 because he cannot establish good cause for failing to raise that argument in a prior proceeding. Additionally, no retroactive change in the law justifies defendant's failure to raise a challenge under the Michigan Constitution in his direct appeal, because neither *Miller* nor *Stovall* addressed the constitutionality of individualized term-of-years sentences for juveniles convicted of second-degree murder. Further, defendant's claim of cruel or unusual punishment requires this Court to determine whether defendant's sentence is grossly disproportionate, but that analysis is precluded by the prior conclusion on direct appeal that defendant's sentence was proportionate.

The majority breaks new ground by applying the *Bullock* factors to an individualized, discretionary term-of-years sentence. Michigan courts have, until now, typically reviewed only nondiscretionary sentences under Const 1963, art 1, § 16; normally, discretionary term-of-years sentences are subject to proportionality review under *Milbourn*. The majority also improperly compares defendant's *individualized*, discretionary sentence to the sentences at issue in *Stovall* and the sentences available for juvenile defendants convicted of first-degree murder, who can still be sentenced to life imprisonment without the possibility of parole under MCL 769.25; a term-of-years sentence is necessarily less severe than a sentence of life imprisonment without the possibility of parole. Moreover, the majority employs the unworkable concept of a "de facto life sentence," creating a host of difficult and unanswerable questions. The majority opinion sets the stage for future constitutional proportionality claims after sentences have been affirmed on direct appeal under nonconstitutional *Milbourn* proportionality review and generates uncertainty regarding upper and lower limits for sentences imposed on juvenile and young-adult offenders convicted of second-degree murder.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 30, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                 No. 168205

JAMES GREGORY EADS,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

THOMAS, J.

In *People v Stovall*, 510 Mich 301, 307-308; 987 NW2d 85 (2022), we held that imposing a sentence of life in prison that provides the possibility of parole (a parolable life sentence) on a juvenile convicted of second-degree murder constitutes "cruel or unusual punishment" in violation of Const 1963, art 1, § 16. This case involves a question we left open in *Stovall*: whether a judge who forgoes a parolable life sentence and, instead,

imposes a lengthy term-of-years sentence on a juvenile offender convicted of second-degree murder violates Const 1963, art 1, § 16.

We conclude that *Stovall*'s reasoning applies equivalently here such that the term-of-years sentence imposed—a minimum sentence of 50 years in prison and a maximum sentence of 75 years in prison—is similarly grossly disproportionate and violates Const 1963, art 1, § 16 when imposed on a youth[1] convicted of second-degree murder. Accordingly, we affirm in part the judgment of the Court of Appeals, which reverses the Wayne Circuit Court's order denying defendant's motion for relief from judgment, vacates defendant's sentence for second-degree murder,[2] and remands to that court for resentencing.

Because we conclude that defendant's sentence is categorically unconstitutional as applied to a youthful offender convicted of second-degree murder, it is unnecessary to address whether, under the specific facts of this case, defendant would also be entitled to relief under *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), or *People v Boykin*, 510 Mich 171; 987 NW2d 58 (2022). Accordingly, we vacate Part VI of the Court of

---

[1] We use "youth" or "youthful offender" in this opinion to refer to those who committed the crime when they were under 21 years old. See *People v Taylor*, ___ Mich ___, ___; ___ NW3d ___ (April 10, 2025) (Docket Nos. 166428 and 166654); slip op at 2 (holding that offenders who were 19 and 20 years old at the time of their offense, as a class, share the same mitigating characteristics of youth as their younger counterparts and, thus, are treated equivalently under Const 1963, art 1, § 16). We use the word "juvenile" when referring to statutes or caselaw that address those who committed an offense before they turned 18 years old.

[2] Defendant has not argued that he is entitled to resentencing for his conviction of possession of a firearm during the commission of a felony. See MCL 750.227b(1) and (3) (mandating a two-year sentence for the first such offense that runs "consecutively with and preceding" the sentence imposed for the underlying felony).

2

Appeals opinion, which addresses whether defendant was entitled to resentencing under *Milbourn* and *Boykin*, and we vacate Part III of that opinion to the extent it addresses whether defendant was procedurally barred by MCR 6.508(D)(2) from raising challenges to his sentence under these decisions.

## I. FACTS AND PROCEDURAL HISTORY

In 1992, defendant, James Gregory Eads, was 16 years old when he shot and killed 17-year-old Eric Kincaid in an apparently gang-related incident. Defendant was charged with first-degree murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The jury found defendant guilty of the lesser included offense of second-degree murder, MCL 750.317, and of felony-firearm. The advisory judicial sentencing guidelines in effect at the time recommended a minimum sentence between 12 and 25 years' imprisonment or parolable life. The trial court sentenced defendant as an adult and imposed a sentence of 50 to 75 years' imprisonment, which was to be served consecutively to a term of two years' imprisonment for felony-firearm.

Among other things, defendant argued in his direct appeal that his sentence was disproportionate under *Milbourn*, 435 Mich 630.[3] The Court of Appeals affirmed

---

[3] In *Milbourn*, we held that the "statutory sentencing scheme embodies the 'principle of proportionality[.]' " *Milbourn*, 435 Mich at 635. Thus, where the Legislature provides the trial court discretion as to what sentence to impose, the court has an obligation to impose a sentence that is "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 636. Appellate courts review the proportionality of a trial court's sentencing decision under *Milbourn* for an abuse of discretion. *Id*. at 660; see also *People v Steanhouse*, 500 Mich 453, 471-472; 902 NW2d 327 (2017) (readopting *Milbourn* proportionality review for a sentence that departs from the guidelines range after the

3

defendant's convictions and sentence. *People v Eads*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 1994 (Docket No. 160735). Defendant filed an application for leave to appeal in this Court, which this Court denied. *People v Eads*, 450 Mich 865 (1995). Three justices were shown on the order as favoring a remand for resentencing pursuant to *Milbourn*. *Id*.

In January 2021, defendant filed a motion for relief from judgment under MCR Subchapter 6.500 (his first such motion), in which he challenged his sentence of 50 to 75 years' imprisonment as unconstitutional and disproportionate in light of *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and its progeny. He argued that the sentencing judge violated the Eighth Amendment and his due-process rights by imposing a disproportionate sentence that failed to properly consider his youth as a mitigating factor under *Miller*, and that his constitutional right to equal protection was violated because he was being treated more harshly than a juvenile convicted of first-degree murder, see MCL 769.25; MCL 769.25a. The trial court denied defendant's motion for relief from judgment, and the Court of Appeals denied defendant's application for leave to appeal. *People v Eads*, unpublished order of the Court of Appeals, entered July 19, 2021 (Docket No. 357332).

Defendant then filed an application for leave to appeal in this Court. While this application remained pending, we issued opinions in *Stovall*, 510 Mich 301, and *Boykin*, 510 Mich 171. In *Stovall*, we held that a parolable life sentence imposed on a juvenile convicted of second-degree murder violates Michigan's constitutional prohibition on cruel

---

mandatory legislative sentencing guidelines were rendered advisory in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015)).

4

or unusual punishment. *Stovall*, 510 Mich at 322. In *Boykin*, we held that a court resentencing a juvenile convicted of first-degree murder to a term-of-years sentence under MCL 769.25 or MCL 769.25a must consider the distinctive attributes of youth as mitigating factors but need not articulate on the record how the defendant's youth affected the sentence imposed. *Boykin*, 510 Mich at 177-178. After those opinions were issued, the Court remanded this case to the Court of Appeals for consideration as on leave granted. *People v Eads*, 512 Mich 918 (2023). That order directed the Court of Appeals to consider "whether the defendant is entitled to relief under *People v Boykin*, 510 Mich 171 (2022), or *People v Stovall*, 510 Mich 301 (2022)." *Eads*, 512 Mich at 918.

On remand, the Court of Appeals held, in a split decision, that defendant was entitled to resentencing. *People v Eads*, ___ Mich App ___, ___; ___ NW3d ___ (January 16, 2025) (Docket No. 357332); slip op at 13. The majority concluded that defendant's motion satisfied the procedural requirements in MCR 6.508(D) because defendant's direct appeal was completed long before *Miller* and its progeny were issued. *Id*. at ___; slip op at 5. On the merits, the majority first analyzed defendant's sentence of 50 to 75 years' imprisonment under Const 1963, art 1, § 16 and the four-factor test from *People v Bullock*, 440 Mich 15, 33-34; 485 NW2d 866 (1992). *Eads*, ___ Mich App at ___; slip op at 8-13. The Court of Appeals majority concluded that the sentence was cruel or unusual punishment under these factors for reasons similar to those articulated in *Stovall* when holding that a parolable life sentence constituted cruel or unusual punishment. *Id*. at ___; slip op at 8-13. The panel then held that defendant's sentence was *also* disproportionate under the related, but distinct, nonconstitutional proportionality requirement in *Milbourn* and *Boykin*. *Id*. at ___; slip op at 14-15. The majority reasoned that the sentencing judge failed to consider

5

defendant's youth as a mitigating factor and, instead, used the characteristics of youth that defendant exhibited as aggravating factors to justify a lengthy term-of-years sentence. *Id.* at ___; slip op at 14-15.

In dissent, Judge MURRAY first concluded that the majority erred in analyzing the proportionality of defendant's sentence under the *Bullock* factors. *Id.* at ___ (MURRAY, P.J., dissenting); slip op at 2-4. In his view, this test applies only to a statutory mandatory punishment or a statutory maximum punishment for an offense; a challenge to a discretionary and individualized term-of-years sentence is assessed only under *Milbourn* and *Boykin*. *Id.* at ___; slip op at 2-4. When a trial judge imposes an individualized sentence that complies with *Milbourn* and *Boykin*, that sentence is necessarily a proportionate sentence that is not cruel or unusual punishment. *Id.* at ___; slip op at 4, 6, 10. Finally, Judge MURRAY concluded that the trial court's sentence here was proportionate under *Milbourn* and *Boykin*. *Id.* at ___; slip op at 4-11. He argued that the sentencing judge was aware of defendant's youth and, under the totality of the circumstances, did not abuse his discretion when he imposed a sentence of 50 to 75 years in prison. *Id.* at ___; slip op at 4-11.

The prosecution filed an application for leave to appeal in this Court, which we granted. *People v Eads*, ___ Mich ___; 25 NW3d 118 (2025). We directed the parties to "include among the issues to be briefed whether the Court of Appeals erred by holding that: (1) the defendant is entitled to relief under *People v Stovall*, 510 Mich 301 (2022); and (2) the defendant is entitled to relief under *People v Boykin*, 510 Mich 171 (2022)." *Id.* at ___; 25 NW3d at 118.

6

## II. STANDARD OF REVIEW

We review a trial court's decision on a motion for relief from judgment for an abuse of discretion. *People v Christian*, 510 Mich 52, 74; 987 NW2d 29 (2022). A trial court necessarily abuses its discretion if it commits an error of law. *Id*. at 75. Whether a defendant's sentence constitutes cruel or unusual punishment under Const 1963, art 1, § 16 is a question of law that we review de novo, meaning that we provide no deference to the lower courts' decisions. *Stovall*, 510 Mich at 312.

## III. PROCEDURAL REQUIREMENTS IN MCR 6.508(D)

A defendant seeking relief from judgment "has the burden of establishing entitlement to the relief requested." MCR 6.508(D). MCR 6.508(D) imposes different burdens depending on whether the defendant "alleges grounds for relief which were *decided against*" them in a previous proceeding, MCR 6.508(D)(2) (emphasis added), or "alleges grounds for relief . . . which *could have been* raised" in a prior proceeding but were not, MCR 6.508(D)(3) (emphasis added).

While defendant in this case challenged his sentence on nonconstitutional *Milbourn* proportionality grounds in his direct appeal, he did not argue in that appeal that his sentence constituted cruel or unusual punishment under Const 1963, art 1, § 16. See *Bullock*, 440 Mich at 34 n 17 (explaining that "the *constitutional* concept of 'proportionality' under Const 1963, art 1, § 16 is distinct from the nonconstitutional 'principle of proportionality' discussed in [*Milbourn*]"). Thus, the Court of Appeals correctly concluded that MCR 6.508(D)(3) applies to defendant's constitutional proportionality challenge under Const

7

1963, art 1, § 16.[4]  To obtain relief on this claim, defendant must demonstrate "good cause for failure to raise such grounds on appeal" and "actual prejudice."  MCR 6.508(D)(3)(a) and (b).[5]  In this context, "actual prejudice" means that a "sentence is invalid."  MCR 6.508(D)(3)(b)(*iv*).

We conclude that defendant has demonstrated "good cause" for failing to raise a constitutional challenge to his sentence on direct appeal.  This Court has consistently recognized as "good cause" an intervening retroactive constitutional decision relevant to the defendant's claims.[6]  His direct appeal was exhausted in 1995, long before *Miller*,

---

[4] In arguing that defendant's constitutional claim is procedurally barred because defendant raised a *Milbourn* proportionality challenge on direct appeal, Justice ZAHRA overlooks this Court's discussion in *Bullock* describing the distinction between nonconstitutional *Milbourn* proportionality review and constitutional proportionality review under Const 1963, art 1, § 16.  Instead, he compares the general standard for *Milbourn* proportionality review with our assertion in a more recent case that "Const 1963, art 1, § 16 requires that criminal sentences be proportional to the circumstances of the offense and of the offender such that excessive imprisonment is prohibited."  *Taylor*, ___ Mich at ___; slip op at 8.  There is certainly overlap between the two inquiries.  See *Bullock*, 440 Mich at 34 n 17 (acknowledging that "the concepts share common roots").  But as discussed in greater detail below, this overlap does not mean that defendant raises the same "grounds for relief" that he raised on direct appeal, given the different functions, sources, and frameworks for these proportionality inquiries.

[5] Given our holding that defendant is entitled to relief on constitutional grounds, it is unnecessary to address whether the Court of Appeals correctly held that defendant's nonconstitutional *Milbourn* proportionality claim satisfied the procedural requirement in MCR 6.508(D)(2).

[6] See *People v Reed*, 449 Mich 375, 384-385 & n 8; 535 NW2d 496 (1995) (opinion by BOYLE, J.) (explaining that "good cause" can be shown if "some factor external to the defense precluded counsel from previously raising the issue," which may include that a legal basis for a claim was not then reasonably available to counsel); see also, e.g., *Stovall*, 510 Mich at 310-311 (holding that the defendant's claim overcame the procedural bar on successive motions for relief from judgment in MCR 6.502(G) because the claim was based on *Miller*, which was a retroactive change in the law, and granting the defendant relief on his claim); *People v Poole*, ___ Mich ___, ___; ___ NW3d ___ (April 1, 2025) (Docket

8

*Stovall*, and other retroactive changes in constitutional law regarding youth sentencing were decided. Moreover, defendant can show that his sentence is "invalid" if it constitutes cruel or unusual punishment under Michigan's Constitution.[7]

## IV. CRUEL OR UNUSUAL PUNISHMENT

Article 1, § 16 of Michigan's 1963 Constitution provides that "cruel or unusual punishment shall not be inflicted[.]" We have long recognized that Michigan's prohibition on "cruel *or* unusual punishment" provides broader protection than the "cruel *and* unusual punishment" counterpart contained in the Eighth Amendment of the United States Constitution. See, e.g., *Stovall*, 510 Mich at 313-314; *Bullock*, 440 Mich at 27-35.

In recent cases, we have interpreted the Michigan Constitution's cruel-or-unusual-punishment clause as providing greater protection for youthful offenders than that provided by the federal Constitution's cruel-and-unusual-punishment clause. For example, while the Eighth Amendment categorically precludes certain punishments for those who are

No. 166813); slip op at 1-2 (holding that *People v Parks*, 510 Mich 225; 987 NW2d 161 (2022), applies retroactively and granting the defendant relief in a successive motion for relief from judgment). Justice ZAHRA suggests that the "good cause" requirement is not satisfied here because both the Eighth Amendment and Const 1963, art 1, § 16 existed when defendant filed his direct appeal. However, as the above cases also illustrate, new caselaw interpreting a constitutional provision can provide "good cause" for failure to raise a claim in a previous proceeding. See also *People v Poole*, 349 Mich App 594, 611; 28 NW3d 769 (2024) (holding that the defendant demonstrated good cause for failing to raise a challenge to his sentence of life imprisonment without the possibility of parole on direct appeal where *Miller* was issued long after that appeal was completed), affirmed by *Poole*, ___ Mich at ___; slip op at 1-2.

[7] See *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997) (explaining that a sentence is invalid "when it is based upon constitutionally impermissible grounds"); see also, e.g., *Stovall*, 510 Mich at 307-308 (holding that a sentence was unconstitutional under Const 1963, art 1, § 16 and granting relief on a successive motion for relief from judgment); *Poole*, ___ Mich at ___; slip op at 1-2 (same).

9

under 18 years old when they commit an offense,[8] we have recognized that Const 1963, art 1, § 16 extends similar protections to those who are under 21 years old.[9] Most relevant here, we have relied on the distinguishing characteristics of youth—such as diminished culpability and greater ability for reform—and related caselaw to conclude that it is categorically cruel or unusual to impose a parolable life sentence on a juvenile convicted of second-degree murder. See *Stovall*, 510 Mich at 322.

In assessing whether a punishment is cruel or unusual in violation of Const 1963, art 1, § 16, we have consistently considered the following factors:

> (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically "rooted in Michigan's legal traditions." [*People v Kardasz*, ___ Mich ___, ___; ___ NW3d ___ (December 19, 2025) (Docket No. 165008); slip op at 33, quoting *Bullock*, 440 Mich at 33-34.]

---

[8] See *Roper v Simmons*, 543 US 551, 578; 125 S Ct 1183; 161 L Ed 2d 1 (2005) (holding that it violates the Eighth Amendment to impose the death penalty on an offender who was under 18 years old at the time of their offense); *Graham v Florida*, 560 US 48, 82; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (holding that it violates the Eighth Amendment to impose a sentence of life imprisonment without the possibility of parole for a nonhomicide offense when the offender was under 18 years old at the time of the offense); *Miller*, 567 US at 465 (holding that it violates the Eighth Amendment to mandatorily sentence any juvenile offender to life imprisonment without the possibility of parole).

[9] See *Parks*, 510 Mich at 232 (holding that, while the United States Supreme Court has drawn the constitutional line for Eighth Amendment purposes at offenders who were under 18 years old at the time of their offense, the principles from *Miller* also apply to 18-year-old offenders under Const 1963, art 1, § 16); *Taylor*, ___ Mich at ___; slip op at 2 (holding that these principles also apply to offenders who were 19 and 20 years old at the time of their offense).

These are often referred to as the "*Bullock* factors."  See, e.g., *Stovall*, 510 Mich at 314.[10]

## A. CONSTITUTIONAL AND NONCONSTITUTIONAL PROPORTIONALITY ANALYSES

As an initial matter, we note that, while both Const 1963, art 1, § 16 and *Milbourn* require that sentences be proportionate, they do so under different frameworks that reflect different focuses and rationales.  As this Court has explained:

> [T]he *constitutional* concept of "proportionality" under Const 1963, art 1, § 16 is distinct from the nonconstitutional "principle of proportionality" discussed in *People v Milbourn*, 435 Mich 630, 650; 461 NW2d 1 (1990), although the concepts share common roots.  The duty of the appellate courts to review trial court sentences within the applicable statutory ranges for abuse of discretion, as reaffirmed in *Milbourn*, is rooted not in Const 1963, art 1, § 16, but rather reflects the Legislature's intent "in setting a range of allowable punishments for a single felony . . . ."  [*Milbourn*,] 435 Mich at 651.  *Milbourn* obviously has no applicability to a legislatively mandated sentence because the trial court, in that case, lacks any discretion to abuse.  *Milbourn* involved the relationship between the trial and appellate courts as they work together to fulfill the Legislature's intent, under the belief "that judicial sentencing discretion should be exercised, within the legislatively prescribed range, according to the same principle of proportionality that guides the Legislature in its allocation of punishment over the full spectrum of criminal behavior."  *Id*.  By contrast, the issue under Const 1963, art 1, § 16, as raised in these cases and others, concerns whether the punishment concededly chosen or authorized by the Legislature is so grossly disproportionate as to be unconstitutionally "cruel or unusual."  [*Bullock*, 440 Mich at 34 n 17.]

---

[10] Some opinions refer to these as the "*Lorentzen* factors" or the "*Lorentzen-Bullock* factors."  See *Parks*, 510 Mich at 254-266; *Taylor*, ___ Mich at ___; slip op at 20-34.  These factors were originally articulated in *People v Lorentzen*, 387 Mich 167, 171-181; 194 NW2d 827 (1972), when analyzing a punishment under both the Eighth Amendment of the United States Constitution and Article 1, § 16 of Michigan's 1963 Constitution.  *Bullock* recognized that this test applies when assessing a punishment under Const 1963, art 1, § 16 regardless of its continued validity under Eighth Amendment jurisprudence.  *Bullock*, 440 Mich at 34-35.

In other words, *Milbourn* proportionality review is a product of the legislative intent for proportionality in sentencing by granting a trial court discretion to impose a sentence within a particular range. Thus, the focus of the *Milbourn* inquiry is whether a sentence imposed is proportionate under this framework. This explains why a statutorily mandated sentence cannot be challenged under *Milbourn*, as well as why a trial court is required to score and consider the now-advisory legislative sentencing guidelines in every case,[11] with the range guiding both a trial court's exercise of its sentencing discretion and an appellate court's review of that chosen sentence.[12] And because the statutory scheme provides a trial

---

[11] See *Lockridge*, 498 Mich at 392 (holding that a trial court must "consult the applicable guidelines range and take it into account when imposing a sentence"); *People v Geddert*, 500 Mich 859, 859 (2016) ("Even though the guidelines ranges are now advisory, the scoring of the guidelines themselves is mandatory . . . ."); *People v Dixon-Bey*, 321 Mich App 490, 524-525; 909 NW2d 458 (2017) ("Because the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a 'useful tool' or 'guideposts' for effectively combating disparity in sentencing.") (citations omitted).

[12] See *Dixon-Bey*, 321 Mich App at 525 (explaining that a court imposing a sentence that departs from the guidelines must explain why that sentence is more proportionate than a sentence within the guidelines and that factors to consider when determining whether the departure sentence is more proportionate than a sentence within the guidelines range include "whether the guidelines accurately reflect the seriousness of the crime," whether there are "factors not considered by the guidelines," and whether there are "factors considered by the guidelines but given inadequate weight"); *People v Posey*, 512 Mich 317, 357-359; 1 NW3d 101 (2023) (opinion by BOLDEN, J.) (holding that on appeal, there is a nonbinding, rebuttable presumption that a sentence within the guidelines range is proportionate, in part because "a within-guidelines sentence reflects that both the sentencing court and sentencing guidelines reached the same conclusion regarding the appropriate punishment for a defendant considering their circumstances and their offenses"); *id*. at 390 (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment) (agreeing with the lead opinion that on appeal there should be a nonbinding, rebuttable presumption of proportionality for a sentence that is within the guidelines range).

court with the discretion to select a sentence within a particular range, appellate review is under a deferential abuse-of-discretion standard.[13]

In contrast, Const 1963, art 1, § 16 provides a *check* on the Legislature's authority to authorize punishment. This necessarily requires an exercise of independent judicial judgment that is informed by considerations outside of legislative intent. Moreover, it is axiomatic that a sentencing judge lacks discretion to impose an unconstitutional sentence. Thus, unlike *Milbourn* proportionality review, appellate courts review de novo whether a sentence violates Const 1963, art 1, § 16. See, e.g., *Stovall*, 510 Mich at 312. Finally, while *Milbourn* proportionality is a highly fact-specific inquiry that is based on the particular circumstances of an offense and offender,[14] the cruel-or-unusual-punishment clause is often applied to an entire class of offenders subject to a particular punishment.[15]

---

[13] See *Milbourn*, 435 Mich at 636; *Steanhouse*, 500 Mich at 471, 476.

[14] See *Milbourn*, 435 Mich at 636 (holding that "the principle of proportionality . . . requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender"); see also *Boykin*, 510 Mich at 183-184 (noting that a sentence within the legislatively prescribed range "should be tailored to the particular circumstances of the case and offender"), citing *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972); see also *Boykin*, 510 Mich at 188-192 (recognizing that a defendant's youth is relevant to imposing a proportionate sentence).

[15] See *Lorentzen*, 387 Mich at 181 (holding that a mandatory minimum sentence of 20 years in prison for selling any amount of marijuana constitutes cruel or unusual punishment); *Bullock*, 440 Mich at 21, 41-42 (holding that a sentence of mandatory life imprisonment without the possibility of parole for possession of 650 grams or more of cocaine constitutes cruel or unusual punishment); *Taylor*, ___ Mich at ___; slip op at 2 (holding that a sentence of mandatory life imprisonment without the possibility of parole for anyone who was under 21 years old when they committed first-degree murder constitutes cruel or unusual punishment).

Given their analytical overlap, a *Milbourn* analysis will likely lead to the same result as a constitutional-proportionality analysis in many cases. But a sentence might be considered reasonable when viewed in the context of the Michigan legislative scheme yet be considered disproportionate under Const 1963, art 1, § 16. It is also possible that a punishment is categorically cruel or unusual as a matter of law when applied to a particular class of offenders such that it is unnecessary to engage in a more fact-specific *Milbourn* proportionality review.[16] It would be inappropriate to interpret a doctrine premised on legislative intent as cutting off an independent constitutional analysis that, by its nature, serves as a limitation on the Legislature's authority. See *Bullock*, 440 Mich at 40-41 (noting that a proper application of the cruel-or-unusual-punishment clause may "require[] us to override a democratically expressed judgment of the Legislature").

---

[16] While there is a general preference for deciding a case, if possible, on the basis of a nonconstitutional argument rather than a constitutional one, see, e.g., *People v McKinley*, 496 Mich 410, 415-416; 852 NW2d 770 (2014), this is only a prudential doctrine that does not foreclose our general discretion to decide a case on the most appropriate grounds. See, e.g., *Lockridge*, 498 Mich 358 (holding that the mandatory sentencing guidelines violated the Sixth Amendment but denying that defendant relief under plain-error review); see also *Zobrest v Catalina Foothills Sch Dist*, 509 US 1, 7; 113 S Ct 2462; 125 L Ed 2d 1 (1993) (declining to apply in that case the "*prudential* rule of avoiding constitutional questions") (emphasis added). Given our conclusion that a straightforward application of *Stovall* supports the conclusion that Const 1963, art 1, § 16 *categorically* forecloses a sentence of 50 to 75 years' imprisonment for a youthful offender convicted of second-degree murder *as a matter of law*, we find it unnecessary and inappropriate to consider a nonconstitutional proportionality argument that is premised on additional factual circumstances in this particular case. See Cooley, Constitutional Limitations, p 163 ("[W]here a constitutional question is raised, . . . yet if the record also presents *some other and clear ground* upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, the court will take that course . . . .") (emphasis added). Here, the *Milbourn*/*Boykin* issue is far from clear and rests on several complicated questions involving other potential constitutional issues, the possible expansion of *Boykin* beyond MCL 769.25 and MCL 769.25a, and issues concerning retroactivity.

14

For these reasons, we find it appropriate to assess defendant's discretionary term-of-years sentence under Const 1963, art 1, § 16 and the *Bullock* factors.[17] In doing so, we find *Stovall*'s analysis of the *Bullock* factors highly instructive. This analysis leads to the conclusion that defendant's sentence of 50 to 75 years' imprisonment for a second-degree murder committed while he was a youth constitutes cruel or unusual punishment.

## B.  *BULLOCK* FACTORS ONE AND TWO

*Stovall* considered *Bullock* factor one (severity of the sentence imposed relative to the gravity of the offense) and *Bullock* factor two (the sentence imposed for the offense compared to sentences imposed in Michigan for other offenses) together. *Stovall*, 510 Mich at 314-318. We similarly consider these factors together in resolving this case.

Like most jurisdictions, Michigan recognizes different categories of homicide offenses that correlate with the comparative level of culpability assigned for an offender's actions. See generally *People v Mendoza*, 468 Mich 527; 664 NW2d 685 (2003). Relevant here, Michigan distinguishes between first-degree murder and second-degree murder, with

---

[17] We reject the dissent's suggestion that the *Bullock* test is inapplicable to a discretionary term-of-years sentence. While we agree that this Court has not yet applied the *Bullock* factors to a discretionary term-of-years sentence, it has applied the factors to a discretionary sentence and to a minimum term-of-years sentence. See *Stovall*, 510 Mich at 314-322; *Lorentzen*, 387 Mich at 170-171 (holding that a mandatory minimum sentence of 20 years' imprisonment before parole eligibility constituted cruel or unusual punishment). Moreover, and more importantly, every defendant—regardless of whether they receive a mandatory minimum sentence or a discretionary term-of-years sentence—is protected from unconstitutional punishments by virtue of Const 1963, art 1, § 16, and the applicable test for a claim under that constitutional provision is the *Bullock* test. See, e.g., Const 1963, art 4, § 45 ("The legislature may provide for indeterminate sentences *as punishment* for crime . . . .") (emphasis added); *Bullock*, 440 Mich at 34 n 17 (noting that "the issue under Const 1963, art 1, § 16, as raised in these cases and others, concerns whether the punishment concededly *chosen or authorized* by the Legislature is so grossly disproportionate as to be unconstitutionally 'cruel or unusual' ") (emphasis added).

first-degree murder recognized as the more serious offense. See, e.g., *Stovall*, 510 Mich at 317; *People v Gay*, 407 Mich 681, 729; 289 NW2d 651 (1980) (WILLIAMS, J., dissenting). First-degree murder is a killing with malice[18] that is committed with premeditation and deliberation, occurs during the course of another listed felony,[19] or is of a peace officer or corrections officer lawfully performing their duties. MCL 750.316(1). In contrast, second-degree murder is a killing committed with malice that does *not* fit the definition of first-degree murder. See MCL 750.317; *People v Oros*, 502 Mich 229, 240 n 4; 917 NW2d 559 (2018).

The statutorily authorized punishment for first-degree murder is more severe than that authorized for second-degree murder. See *People v Jenkins*, 395 Mich 440, 442; 236 NW2d 503 (1975), overruled in part on other grounds by *People v Cornell*, 466 Mich 335 (2002). Generally, a conviction of first-degree murder triggers a mandatory sentence of life imprisonment without the possibility of parole (LWOP), MCL 750.316(1), while a conviction of second-degree murder provides a trial court discretion to impose a sentence of "life, or any term of years," MCL 750.317. Under current law, the sentencing guidelines are scored for second-degree murder. See MCL 777.21; MCL 777.16p. When imposed, a

---

[18] "Malice may be established in three ways: by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022). "First- and second-degree murder both include the element of malice aforethought." *People v Yeager*, 511 Mich 478, 500; 999 NW2d 490 (2023).

[19] This second category is often referred to as "first-degree felony murder" or simply "felony murder." See, e.g., *People v Ream*, 481 Mich 223; 750 NW2d 536 (2008) (using the two phrases interchangeably).

"life" sentence for second-degree murder means that the defendant is eligible for release on parole 10 or 15 years into serving their sentence, but eligibility for parole does not necessarily mean that the person will ever actually be paroled. See MCL 791.234(7)(a).[20] If a judge instead decides to impose a "term of years" sentence for second-degree murder, they must impose an indeterminate sentence that complies with *Milbourn* proportionality principles. *People v Lemons*, 454 Mich 234, 258; 562 NW2d 447 (1997).[21]

In light of recent constitutional caselaw, sentencing options and procedures for youthful offenders convicted of murder differ from the options and procedures for older offenders. In response to *Miller*'s holding that it violates the Eighth Amendment to impose a mandatory LWOP sentence on a juvenile, the Michigan Legislature enacted statutes specifically governing the sentencing of such offenders convicted of crimes punishable by mandatory LWOP. See MCL 769.25; MCL 769.25a. Under this scheme, the default sentence for any juvenile convicted of first-degree murder is a term-of-years sentence with a minimum sentence between 25 years and 40 years and a maximum sentence of at least

_____

[20] A person serving a parolable life sentence who committed their crime before October 1, 1992, is first eligible for parole after serving 10 years in prison, while a person serving such a sentence who committed their crime on or after October 1, 1992, is first eligible for parole after serving 15 years in prison. MCL 791.234(7)(a); see also *Hopkins v Parole Bd*, 237 Mich App 629, 637; 604 NW2d 686 (1999) ("[T]he Parole Board . . . possesses exclusive discretion to grant or deny parole.").

[21] This Court had previously held that a "term of years" sentence imposed under MCL 750.317 must provide the defendant a reasonable prospect of release in their lifetime. See, e.g., *People v Moore*, 432 Mich 311, 329; 439 NW2d 684 (1989). However, we later disavowed that approach and held that the statute permits a court to impose any term-of-years sentence, subject to *Milbourn* proportionality review. See *Lemons*, 454 Mich at 258.

60 years. See MCL 769.25(9); MCL 769.25a(4)(c).[22] LWOP can be imposed on such an offender only if the prosecutor moves to impose such a sentence, see MCL 769.25(2) and (3); MCL 769.25a(4)(b), the trial court conducts a hearing to consider the *Miller* factors, see MCL 769.25(6); MCL 769.25a(4)(b), and, after considering these factors, the trial court concludes that the prosecutor has rebutted, by clear and convincing evidence, the presumption that an LWOP sentence is disproportionate, see *People v Taylor*, 510 Mich 112, 119-120; 987 NW2d 132 (2022). This Court has subsequently held that Michigan's cruel-or-unusual-punishment provision mandates that these same procedures apply to anyone who was under 21 years old when they committed first-degree murder. *People v Taylor*, ___ Mich ___, ___; ___ NW3d ___ (April 10, 2025) (Docket Nos. 166428 and 166654); slip op at 2.

When addressing the constitutionality of a parolable life sentence for a juvenile convicted of second-degree murder, *Stovall* analyzed *Bullock* factors one and two within the context of these sentencing procedures governing youths convicted of first-degree murder. *Stovall* reasoned that a parolable life sentence is the most serious penalty that can be imposed for second-degree murder and "is particularly severe when imposed on a juvenile, given the important mitigating ways that children are different from adults." *Stovall*, 510 Mich at 314-315. While second-degree murder is a grave offense, it is less serious than first-degree murder. *Id*. at 315. Yet a parolable life sentence is not an option for a juvenile convicted of first-degree murder who, after a *Miller* hearing, is not sentenced

---

[22] For a juvenile convicted of first-degree murder after *Miller* was decided who is not sentenced to LWOP, the "maximum term shall be not less than 60 years." See MCL 769.25(9). For a defendant in this situation who was convicted before *Miller* was decided, the maximum term "shall be 60 years." See MCL 769.25a(4)(c).

to LWOP. *Id*. at 316-317. Moreover, a parolable life sentence "is often *more* severe than the minimum sentences now given to most juveniles who commit *first-degree* murder: 25 to 40 years." *Id*. at 316. This often more severe sentence can be imposed on juveniles convicted of second-degree murder absent the "significant procedurals safeguard[s]" afforded to juveniles convicted of the more serious offense of first-degree murder. *Id*.; see also MCL 769.25(9); MCL 769.25a(4)(c); *Taylor*, 510 Mich at 119-120.

*Stovall* then compared the maximum term-of-years sentence that is statutorily permitted for a juvenile convicted of first-degree murder to a parolable life sentence. *Stovall*, 510 Mich at 317. The statutory maximum term-of-years sentence for a youth convicted of first-degree murder who is not sentenced to LWOP is typically 60 years, see MCL 769.25(9); MCL 769.25a(4)(c), which means that such a defendant is generally guaranteed to be released from prison after serving 60 years. *Id*. at 317-318. In contrast, a juvenile convicted of the lesser offense of second-degree murder and sentenced to parolable life is not guaranteed release from prison at all. *Id*. at 318. "That the Parole Board's authority over juvenile offenders convicted of lesser offenses extends further into their term of incarceration is evidence of disproportionality." *Id*.

*Stovall*'s rationale supports the conclusion that a sentence of 50 to 75 years' imprisonment for a second-degree murder committed by a youth also constitutes cruel or unusual punishment. This sentence provides minimum and maximum sentences that are more severe than the minimum and maximum term-of-years sentences that are presumptively imposed on a youth convicted of the more serious offense of first-degree

murder—and without the procedural safeguards provided to such offenders.[23]  See *id*. at 316-318.

Additionally, a sentence of 50 to 75 years' imprisonment is at least as severe as a parolable life sentence.[24]  An offender convicted of second-degree murder who is subject to a parolable life sentence is first eligible for parole after serving only 10 or 15 years in prison, see MCL 791.234(7)(a), while a 50-year minimum sentence requires an offender to serve decades longer before parole eligibility.[25]  Many courts in other jurisdictions have

---

[23] To that end, the dissent misses the mark when it argues that sentences for first- and second-degree murder are incomparable.  To support that argument, the dissent asserts that "[i]f we accept the premise that the two kinds of sentences are comparable, we cannot ignore" the "obvious fact that juveniles convicted of first-degree murder can still be sentenced to LWOP."  This argument overlooks the procedural requirements for imposing LWOP on a youthful offender convicted of first-degree murder.  As we've noted, such sentences should be "relatively rare," *Taylor*, 510 Mich at 139, and reserved for those who demonstrate "irreparable corruption," *id*. at 127 (quotation marks and citation omitted).  Because LWOP will be "relatively rare," most youthful defendants convicted of first-degree murder will receive a term-of-years sentence, making it the more apt comparison to the sentence at issue in this case.  Moreover, as we explain above, first-degree murder is a more serious offense than second-degree murder.  In some cases, such as this one, the jury will decline to convict a defendant of first-degree murder and instead will convict the defendant of the lesser included offense of second-degree murder.  Viewed in that context, we cannot ignore the fact that defendant received a sentence more severe than the minimum and maximum term-of-years sentences that are presumptively imposed on a youth convicted of the more serious offense of first-degree murder.

[24] The record suggests that the trial court might have imposed a lengthy term-of-years sentence because this sentence would be more severe than a parolable life sentence, as the trial court stated that a parolable life sentence would render defendant "eligible for parole after ten years."

[25] The Michigan Department of Corrections (MDOC) website currently estimates that defendant in this case will first be eligible for parole on August 8, 2040, after he will have served approximately 48 years in prison.  See generally MDOC, *Offender Tracking Information System* <https://mdocweb.state.mi.us/OTIS2/Profile> (accessed June 29, 2026).  This estimate appears to reflect possible disciplinary credits he might receive.  See MCL 800.33(3) and (5), as amended by 1986 PA 322; MCL 791.233b(n), as amended by

concluded that a sentence at or around 50 years before parole eligibility is a de facto life sentence for the less protective Eighth Amendment,[26] with some cases treating shorter

---

1989 PA 252; see also *Eads*, ___ Mich App at ___ n 18; slip op at 10 n 18 (suggesting that, when factoring in defendant's two-year consecutive sentence for felony-firearm and presupposing that defendant receives all statutorily available disciplinary credits, defendant "would have to serve slightly more than 40 years' imprisonment before even conceivably becoming eligible for parole for the first time"). In our prior cases addressing whether sentences were constitutionally disproportionate, we have not considered the possible reduction of a minimum sentence for good-time or disciplinary credits in examining the gravity of the punishment. See *Lorentzen*, 387 Mich at 171-179 (examining *Bullock* factors one, two, and three by reference to the statutorily prescribed 20-year mandatory minimum sentence, even though a defendant who received full good-time credits could have served as little as 10 years, 7 months, and 6 days in prison); see also *People v Stewart (On Rehearing)*, 400 Mich 540, 554; 256 NW2d 31 (1977) (concluding that "a mandatory minimum imprisonment of 20 years" for selling any amount of heroin was not cruel or unusual, and analyzing that 20-year sentence while noting that the individual in that case could be eligible for parole in 10 years, 7 months, and 6 days, if "given full credit for good time"); cf. *People v Fleming*, 428 Mich 408, 425; 410 NW2d 266 (1987) (holding that it is improper to enhance a defendant's sentence on the basis of anticipated receipt of good-time reductions).

[26] See, e.g., *State ex rel Carr v Wallace*, 527 SW3d 55, 56-57 (Mo, 2017) (holding that a 50-year minimum sentence for capital murder imposed without the jury having any opportunity to consider the mitigating and attendant circumstances of the 16-year-old defendant's youth violated the Eighth Amendment); *Carter v State*, 461 Md 295, 365; 192 A3d 695 (2018) (holding that an aggregate sentence of 100 years' imprisonment under which a juvenile offender would not be eligible for parole for 50 years was an unconstitutional LWOP sentence under the Eighth Amendment); *Casiano v Comm'r of Correction*, 317 Conn 52, 78-79; 115 A3d 1031 (2015) (holding that a sentence of 50 years' imprisonment without parole for a youth was a de facto LWOP sentence and required a *Miller* hearing); *White v Premo*, 365 Or 1, 3, 15; 443 P3d 597 (2019) (holding that a 54-year sentence was an unconstitutional LWOP sentence for a 15-year-old double-homicide offender where the sentencing court did not find that the defendant was a rare, irreparably corrupt youth under *Miller*, and stating that "[w]e know of no state high court that has held that a sentence in excess of 50 years for a single homicide provides a juvenile with a meaningful opportunity for release"); *State v Zuber*, 227 NJ 422, 428-432; 152 A3d 197 (2017) (holding that a 110-year aggregate sentence on multiple counts, including felony murder, with a 55-year minimum prior to parole eligibility was "the practical equivalent of life without parole" under both the state and federal constitutions, requiring a *Miller* hearing); *People v Contreras*, 4 Cal 5th 349, 356, 367-370; 411 P3d 445 (2018) (holding

21

minimum sentences as equivalent to a life sentence.[27]  It is unnecessary to definitively draw

a line in this case as to what we consider to be a de facto life sentence for the purposes of

Const 1963, art 1, § 16.[28]  But we find it highly pertinent that the 50-year minimum

that a 50-year minimum sentence for a 16-year-old convicted of nonhomicide kidnapping and sex offenses was "the functional equivalent of LWOP" and violated *Graham*); *State v Null*, 836 NW2d 41, 45, 72 (Iowa, 2013) (holding that a sentence requiring 52.5 years' incarceration prior to parole eligibility for a youth was unconstitutional and required a *Miller* hearing); *State v Booker*, 656 SW3d 49, 66 (Tenn, 2022) (holding that imposing on a juvenile a mandatory 60-year sentence that required the person to serve at least 51 years in prison violated the Eighth Amendment).

[27] See, e.g., *State v Kelliher*, 381 NC 558, 560; 873 SE2d 366 (2022) (holding that any sentence that requires a juvenile to serve more than 40 years in prison before parole eligibility is a de facto life sentence that violates the federal and state constitutions); *Bear Cloud v State*, 334 P3d 132, 136, 141-142; 2014 WY 113 (2014) (holding that a juvenile offender's aggregate sentence requiring just over 45 years' imprisonment prior to parole eligibility "result[ed] in the functional equivalent of life without parole"); *State v Haag*, 198 Wash 2d 309, 313, 328-330; 495 P3d 241 (2021) (holding that a 46-year minimum sentence imposed on a juvenile offender following a *Miller* hearing and pursuant to "a *Miller*-fix" statute was still unconstitutional de facto life imprisonment under both the state and federal constitutions); *Fletcher v State*, 532 P3d 286, 319-320 (Alas App, 2023) (holding that a sentence requiring a juvenile defendant to serve 45 years in prison before parole eligibility was a de facto LWOP sentence that violated *Miller* and the state constitution); *People v Buffer*, 2019 IL 122327, ¶ 40; 137 NE3d 763 (2019) (holding that a prison sentence greater than 40 years for a juvenile defendant constitutes de facto LWOP under the Eighth Amendment and remanding for a *Miller* hearing); *State v Pearson*, 836 NW2d 88, 89, 96-97 (Iowa, 2013) (holding that the imposition of a 35-year minimum prison sentence without the possibility of parole on a juvenile offender who committed nonhomicide offenses was unconstitutional under the state and federal constitutions absent a *Miller* hearing).

[28] In dissent, Justice ZAHRA argues that "a term-of-years sentence is necessarily less severe than a sentence of LWOP."  Relatedly, he objects to our recognition that it is possible for a lengthy term-of-years sentence to be considered a "de facto life sentence" for constitutional purposes.  However, as many courts have recognized, such an inquiry is unavoidable when giving meaning to a constitutional prohibition on a life sentence for a juvenile offender.  See notes 26 and 27 of this opinion.  In addition, state supreme courts across the country grappled with the question after *Graham v Florida*, and despite recognizing the difficulty of line-drawing, many have addressed the issue on a case-by-case basis as necessary.  See *Graham*, 560 US at 82; see, e.g., *Henry v State*, 175 So 3d

sentence imposed here creates, at minimum, a good possibility that a youthful offender will not live long enough to even be *eligible* for parole.[29]  And under any metric, it is highly unlikely that a youthful offender will live long enough to reach the mandatory parole discharge date for a 75-year maximum sentence.[30]  Thus, similar to the parolable life

675, 679 (Fla, 2015) (resolving a lower-court split, applying *Graham* to a long term-of-years sentence, and "hold[ing] that the constitutional prohibition against cruel and unusual punishment under *Graham* is implicated when a juvenile nonhomicide offender's sentence does not afford any 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' "), quoting *Graham*, 560 US at 75.  We refer to this caselaw regarding de facto life sentences for juvenile offenders as additional evidence that the punishment imposed here is unduly severe given the lesser culpability for second-degree murder when compared to first-degree murder.  Justice ZAHRA speculates as to the downstream effects of our reference to this concept as one relevant consideration in the *Bullock* analysis.  However, this Court has embraced the concept that youthful offenders are "constitutionally different from adults for purposes of sentencing."  See, e.g., *Taylor*, 510 Mich at 124 (quotation marks and citation omitted); *Parks*, 510 Mich at 235; *Taylor*, ___ Mich at ___; slip op at 9-13.  Our holding in this case is that a sentence of 50 to 75 years' imprisonment for a *youthful* offender convicted of second-degree murder is cruel or unusual punishment for many of the same reasons that *Stovall* concluded that a parolable life sentence for such an offender is cruel or unusual punishment.

[29] Again, the record suggests that this was the trial court's intent, given that the trial court believed that defendant's life expectancy was "53.11 years" and the trial court did not think defendant should be out on parole "until he reaches about 50 years of age . . . ."

[30] As of 2024, the average life expectancy at birth for the entire United States population was 76.5 years for a male and 81.4 years for a female, both of which match or exceed average life expectancy at birth for every year since 1900.  See U.S. Centers for Disease Control and Prevention (CDC), National Center for Health Statistics, *Mortality in the United States, 2024* (January 29, 2026), p 2, available at <https://www.cdc.gov/nchs/data/databriefs/db548.pdf> (accessed June 29, 2026) [https://perma.cc/3P7V-YE5W]; CDC, National Center for Health Statistics, *Life Expectancy Table* <https://www.cdc.gov/nchs/data/hus/2020-2021/LExpMort.pdf> (accessed June 29, 2026) [https://perma.cc/Y35E-9HKJ].  And there is substantial evidence that those sentenced to a long term of imprisonment have a lower life expectancy than the general population.  See, e.g., Daza, Palloni & Jones, *The Consequences of Incarceration for Mortality in the United States*, 57 Demography 577, 591 (2020).  Thus, a 75-year

sentence addressed in *Stovall*, a youthful offender's opportunity for release from prison—

assuming they live long enough to have the opportunity—is likely to be forever contingent

on the parole board's discretion.  See *Stovall*, 510 Mich at 317-318.[31]

_____

sentence *itself* likely exceeds a male's average life expectancy regardless of their age when the sentence is imposed and would effectively do so for a female as well.

As to this particular defendant, the MDOC Offender Tracking Information System currently estimates that his maximum discharge date (seemingly with estimated disciplinary credits) is in 2060, when he would be 85 years old.

[31] In *People v Rushlow*, 437 Mich 149, 150, 156; 468 NW2d 487 (1991), we stated that, when possible disciplinary credits were considered, a sentence of 75 to 150 years' imprisonment imposed on a 26-year-old defendant provided him "a reasonable prospect of actually serving his sentence."  However, *Rushlow* was issued over 35 years ago and did not cite any legal or empirical support for the conclusion that there was a "reasonable prospect" a prisoner serving a lengthy sentence would live into their late 80s or early 90s. See contra *Lorentzen*, 387 Mich at 174-175 (summarizing a prior case where this Court stated that " '[w]here the punishment for an offense is for a term of years, to be fixed by the judge, it should never be made to extend beyond the average period of persons in prison life, which seldom exceeds 25 years' "), quoting *People v Murray*, 72 Mich 10, 17; 40 NW 29 (1888).  Moreover, *Rushlow* was not considering a *constitutional* challenge to a *youthful* defendant's sentence under the *Bullock* factors.  Rather, the question was whether the defendant's sentence fit the statutory definition of "term of years" in MCL 750.317 under subsequently overruled caselaw that required a court to impose a term-of-years sentence that was not effectively a life sentence.  See *Moore*, 432 Mich at 329, superseded by *Lemons*, 454 Mich at 257 (declining to rely on *Moore* in light of subsequent decisions and holding that a judge has discretion to impose *any* term-of-years sentence as long as the sentence satisfies the *Milbourn* proportionality standard).  Thus, we conclude that *Rushlow* has no precedential force here and is not relevant to our analysis of defendant's sentence under Const 1963, art 1, § 16 and the *Bullock* factors.  For similar reasons, we reject Justice ZAHRA's assertion that *Lemons* is contrary to our holding in this case.  *Lemons* addressed whether a lengthy sentence imposed on a 45-year-old defendant was a "term of years" sentence under MCL 750.520b(2) and whether that sentence satisfied nonconstitutional *Milbourn* proportionality review; *Lemons* did not address a constitutional proportionality challenge under Const 1963, art 1, § 16 to a sentence imposed on a youthful offender.  See *Lemons*, 454 Mich at 236, 257-260.

24

In a footnote, *Stovall* recognized two ways in which a term-of-years sentence is "less harsh than a life sentence." *Id*. at 314 n 3. The Court noted that (1) those serving parolable life sentences are given lesser priority for scarce rehabilitative and educational programming than those subject to a term-of-years sentence, and (2) those subject to a term-of-years sentence are generally considered for parole at no more than two-year intervals, whereas those serving parolable life sentences are reviewed for parole eligibility only at five-year intervals after serving 15 years of their sentence. *Id*. The prosecutor contends that these observations indicate that *Stovall*'s reasoning is limited to a parolable life sentence and should not be extended to a term-of-years sentence. But immediately after making these observations, the Court stated that it was "express[ing] no opinion on whether a long term-of-years sentence imposed on a juvenile would violate Const 1963, art 1, § 16." *Id*. To the extent that this footnote in *Stovall* accurately captured characteristics that might make a lengthy term-of-years sentence less harsh than a life sentence in some instances, we now conclude that these distinctions do not make the lengthy term-of-years sentence here different enough from a parolable life sentence to warrant a different conclusion.

While *Stovall* recognized that offenders subject to a term-of-years sentence may "be given *higher* priority for scarce rehabilitative and educational programming" than offenders serving parolable life, *id*. (emphasis added), the Court did not address how available such services would be for those serving a lengthy term-of-years sentence in comparison to other prisoners who are serving a shorter sentence. And there is evidence to suggest that prisoners serving a lengthy term-of-years sentence are treated similarly to

those serving a parolable life sentence in their priority for programming.[32]  To the extent that there is a meaningful difference, access to programming is important for youths because it allows them "to enhance their growth and rehabilitative protentional" such that they are more likely to be granted parole and to flourish in society upon their release from prison.  See *id*. at 314 n 3, 320-321.  But like an offender serving a parolable life sentence, an offender serving a sentence of 50 to 75 years in prison is unlikely to ever be guaranteed release from prison.  Indeed, such an offender is not even eligible for release on parole until decades later than an offender sentenced to parolable life.  Relatedly, the more frequent review of parole eligibility must be considered together with the fact that an offender serving such a sentence must spend significantly more time in prison before they are even eligible for parole consideration at all.  In other words, any benefit to a defendant from more periodic parole review with respect to their ability to obtain release is undermined where their initial review does not occur until they have served 50 years in prison.  Thus, these considerations are not sufficiently mitigating to meaningfully distinguish the severity of the sentence at issue here from the parolable life sentence addressed in *Stovall*.

---

[32] In support of this assertion, the Court of Appeals below cited MDOC Policy Directive 05.02.112, addressing "Education Programs for Prisoners." *Eads*, ___ Mich App at ___ & nn 21-22; slip op at 13 & nn 21-22.  This policy directive has been revised since the Court of Appeals issued its opinion on January 16, 2025.  Nonetheless, the revised directive still indicates that prisoners serving a lengthy term-of-years sentence are treated equivalently with prisoners serving a life sentence in terms of priority for academic classes and career and technical education, as priority for such programming is based on a prisoner's proximity to their earliest release date or parole discharge date.  MDOC, *Education Programs for Prisoners*, PD 05.02.112 (July 28, 2025), pp 4-5, ¶ T, p 7, ¶ JJ, available at <https://www.michigan.gov/corrections//media/Project/Websites/corrections/Files/Policy -Directives/PDs-05-Institutional Placement-and-Programs/PD-0502-Education-and-Work- Assignments/05-02-112 Education-Programs-for-Prisoners-effective-04-05 21.pdf?rev=45059dfe9fa84a0e91c7fa626a478891> (accessed June 29, 2026) [https://perma.cc/QA9B-S3US].

Like in *Stovall*, *Bullock* factors one (severity of the sentence imposed relative to the gravity of the offense) and two (the sentence imposed for the offense compared to sentences imposed in Michigan for other offenses) support the conclusion that a sentence of 50 to 75 years' imprisonment for a second-degree murder committed by a youthful offender constitutes cruel or unusual punishment. Similar to a parolable life sentence, a sentence of 50 to 75 years' imprisonment is harsher than the permissible term-of-years sentence for a youth convicted of the more serious offense of first-degree murder. Further, such a sentence is likely to render an individual's opportunity for release contingent on the parole board's discretion for that individual's entire lifetime. Finally, such a sentence requires an offender to serve decades longer before parole eligibility is reached than with a parolable life sentence, making it questionable whether they will live long enough to even become *eligible* for parole.[33]

## C. *BULLOCK* FACTOR THREE

*Bullock* factor three requires us to compare the sentence at issue with the sentences imposed for the same offense in other jurisdictions. *Stovall*, 510 Mich at 314.[34] *Stovall*

---

[33] While our holding is not limited to such offenders, this sentence is especially problematic where, as here, a defendant is charged with, but acquitted of, first-degree murder and convicted of the lesser included offense of second-degree murder. See *Eads*, ___ Mich App at ___; slip op at 11 ("[Defendant] was originally charged with first-degree murder but, ironically, he has fared worse than he would have if the jury had convicted him of that more severe offense."); cf. *People v Beck*, 504 Mich 605, 609; 939 NW2d 213 (2019) (holding that it violates due process to impose a sentence that is based, in part, on acquitted conduct).

[34] In dissent, Justice ZAHRA, citing *Eads*, ___ Mich App at ___ (MURRAY, P.J., dissenting); slip op at 2-3, argues that it is impossible to compare an individualized term-of-years sentence to the sentences imposed in other jurisdictions. In his view, such a comparison is impossible because the unique characteristics that are considered when imposing an individualized sentence are not shared by any other offender or offense and are not reflected

held that this factor supported the conclusion that a parolable life sentence for a juvenile convicted of second-degree murder is cruel or unusual. The Court noted "a clear national trend toward treating juveniles less harshly than adults and extending *Miller* beyond just the mandatory LWOP context." *Id*. at 318-319. The Court further noted that "many states authorize term-of-years sentences for second-degree murder and do not allow parolable life sentences—for *anyone*, not just juveniles." *Id*. at 319-320. Finally, the Court observed that "[o]f the states that do authorize parolable life for second-degree murder, some have recognized the difference between children and adults by making children sentenced to parolable life eligible for parole sooner." *Id*. at 320.

This reasoning also supports the conclusion that it is cruel or unusual punishment to impose a sentence of 50 to 75 years' imprisonment on a youthful offender convicted of second-degree murder. While *Stovall* highlighted that many states authorize a term-of-years sentence for second-degree murder, as the Court of Appeals majority noted, "none

---

in the statutory provisions governing sentences in other jurisdictions. Thus, he would conclude that the *Bullock* framework can apply only if the sentence at issue is " 'a specific, mandated statutory punishment.' " (Quoting *Eads*, ___ Mich App at ___ (MURRAY, P.J., dissenting); slip op at 2.)

This contention overlooks that *Stovall* analyzed the constitutionality of a parolable life sentence using the *Bullock* factors (including comparing that sentence to those authorized in other jurisdictions) even though the imposition of that sentence was discretionary. See MCL 750.317; *Stovall*, 510 Mich at 314-322. Like the Court of Appeals majority, "[w]e fail to see, under the law or otherwise, why the considerations outlined in *Bullock* would properly inform an analysis of the cruel or unusual nature of a court's choice of one legislatively authorized punishment for second-degree murder—parolable life—but not its choice of another—a term of years of any length." *Eads*, ___ Mich App at ___ (opinion of the Court); slip op at 13 n 23. As illustrated in *Stovall* and in this opinion, it is possible to utilize the *Bullock* factors for term-of-years sentences and to, therefore, compare an individualized sentence to those authorized or imposed in other jurisdictions.

28

of the jurisdictions referenced in *Stovall* permitted a term-of-years sentence nearly as severe as [defendant's]." *Eads*, ___ Mich App at ___; slip op at 12, citing *Stovall*, 510 Mich at 319-320.[35] The only jurisdictions that come close to defendant's sentence are Tennessee and West Virginia, which both currently provide a maximum sentence of 60 years.[36] "All other referenced jurisdictions had a *maximum* term-of-years sentence that was the same as or shorter than [defendant's] *minimum* of 50 years' imprisonment." *Eads*, ___ Mich App at ___; slip op at 12, citing *Stovall*, 510 Mich at 319-320.[37]

---

[35] "See, e.g., Ariz Rev Stat Ann 13-710 (providing for a minimum of 10 years and a maximum of 29 years for second-degree murder); Ark Code Ann 5-10-103 (providing that second-degree murder is a Class A felony) and Ark Code Ann 5-4-401 (providing that the punishment for Class A felonies is a determinate sentence of 6 to 30 years); Ga Code Ann 16-5-1 (providing for a 10- to 30-year sentence for second-degree murder); Iowa Code 707.3 (providing for a 50-year maximum sentence for second-degree murder); Md Code, Crim Law 2-204 (providing for a 40-year maximum sentence for second-degree murder); Minn Stat 609.19 (same); New Mex Stat Ann 30-2-1 (providing that second-degree murder is a second-degree felony resulting in the death of a human being) and New Mex Stat Ann 31-18-15[A](4)[, as amended by 2019 HB 342] (setting the punishment for second degree felonies at 15 years in prison) [NM Stat Ann 31-18-15 as of the date of this opinion now sets the punishment for a second-degree felony resulting in the death of a human being at 18 years in prison]; Tenn Code Ann 39-13-210 (providing that second-degree murder is a Class A felony) and Tenn Code Ann 40-35-112 (providing that Class A felonies are subject to sentences of 15 to 60 years); Va Code 18.2-32 (providing for a minimum sentence of five years and a maximum sentence of 40 years for second-degree murder); W Va Code 61-2-3[, as amended by 1994 HB 4654] (providing for a 10- to 40-year sentence for second-degree murder). [W Va Code 61-2-3 as of the date of this opinion now provides for a 15- to 60-year sentence for second-degree murder]." *Stovall*, 510 Mich at 319-320.

[36] Tenn Code Ann 39-13-210; Tenn Code Ann 40-35-112; W Va Code 61-2-3.

[37] In addition to the statutes cited in *Stovall*, we note Ala Code 15-22-28(e)(2) (all persons convicted of murder or other enumerated Class A felonies on or after March 21, 2001, are eligible for parole after completing 85% of their total sentence or 15 years, whichever is less); Colo Rev Stat 18-3-103(3)(a), Colo Rev Stat 18-1.3-406(1)(a), and Colo Rev Stat 18-1.3-401(1)(a)(V.5)(A) (providing a minimum sentence of up to 16 years and a maximum sentence of up to 48 years for second-degree murder); 730 Ill Comp Stat 5/5-4.5-30(a) (providing that the punishment for second-degree murder is a determinate

29

Additionally, many state legislatures have enacted laws that reduce or abolish lengthy minimum sentences like the one at issue for young people convicted of any homicide offense. See *Fletcher v State*, 532 P3d 286, 296-298 (Alas App, 2023) (noting that many jurisdictions set parole or resentencing eligibility for juveniles convicted of *first-degree murder* between 20 and 30 years and that "no jurisdiction that has fixed a maximum parole eligibility for juvenile offenders [convicted of first-degree murder] requires juvenile offenders to serve more than 40 years before becoming eligible for parole"); *State v Booker*, 656 SW3d 49, 61-63 (Tenn, 2022) (noting that "thirty-six or nearly three-fourths of other states allow juvenile [homicide] offenders release eligibility in less than thirty-five years" and that no state provides a court discretion to impose a minimum sentence of more than 50 years for first-degree murder).[38]

---

sentence between 4 and 20 years or, if there are aggravating circumstances, between 15 and 30 years); and Minn Stat 609.19 (providing a determinate sentence of no more than 40 years for second-degree murder).

[38] See, e.g., Ark Code Ann 16-93-621(a)(2)(A) (youth convicted of a homicide offense are eligible for parole after serving 25 or 30 years); Cal Penal Code 3051(b) (youth who committed an offense before age 26 are eligible for parole after serving 15, 20, or 25 years); Conn Gen Stat 54-125a(f) (youth sentenced to 50 years or less are eligible for parole after serving 60% of the sentence or 12 years, whichever is greater, and youth sentenced to more than 50 years are eligible for parole after serving 30 years); 730 Ill Comp Stat 5/5-4.5-115(b) (with limited exceptions, youth under age 21 at the time of committing an offense other than first-degree murder are eligible for parole after serving 10 years, and youth under age 21 at the time of committing first-degree murder are eligible for parole after serving 20 years; all youth under age 21 are eligible for parole after serving 40 years or more); Md Code Ann, Crim Pro 8-110 (youth convicted of a crime while under age 25, with limited exceptions, are eligible to apply for a sentence reduction after serving 20 years); Nev Rev Stat 213.12135 (youth are eligible for parole after serving 15 years if the offense did not result in the death of another person and after serving 20 years if the offense resulted in the death of only one person); NM Stat Ann 31-21-10.2(A) (youthful offenders are eligible for parole after serving 15 to 25 years, depending on the offense); ND Cent Code 12.1-32-13.1(1)(a) (youth are eligible for sentence reduction after serving 20 years); Ohio Rev Code

In sum, the national trends that *Stovall* relied upon four years ago support the conclusion that many jurisdictions do not permit a sentence of 50 to 75 years' imprisonment for a second-degree murder committed by a youthful offender. Accordingly, this factor also weighs in favor of concluding that this sentence is cruel or unusual.

## D. *BULLOCK* FACTOR FOUR

The fourth *Bullock* factor considers whether a punishment advances the penological goal of rehabilitation. *Stovall*, 510 Mich at 314. In assessing this factor, *Stovall* reasoned that "although a parolable life sentence may advance the penological goal of rehabilitation in theory, for juvenile offenders the question is whether that parolable life sentence provides a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id*. at 320 (citations omitted). The Court then concluded that a parolable life sentence did not advance the goal of rehabilitation for three reasons, all of which apply equivalently to the sentence at issue for reasons discussed earlier in this opinion.

---

Ann 2967.132 (youth are eligible for parole after serving 18 to 30 years unless they were the principal offender in each offense that involved the purposeful killing of three or more persons); RI Gen Laws 13-8-13(e) (youth who committed an offense before age 22 are eligible for parole after serving 20 years, unless they are serving LWOP); Va Code Ann 53.1-165.1(F) (youth sentenced to life imprisonment are eligible for parole after serving 20 years); Wash Rev Code 9.94A.730(1) (youth are eligible for parole after serving 20 years, with exceptions for any youth who committed aggravated murder, a sex offense against a child, or certain additional offenses after turning 18 years old); W Va Code 61-11-23(b) (youth are eligible for parole after serving 15 years); Wyo Stat Ann 6-10-301(c) (youth sentenced to life imprisonment are eligible for parole after commutation to a term-of-years sentence or after serving 25 years unless the person assaulted a prison official or attempted to escape prison after turning 18 years old); DC Code 24-403.03(a) (the court shall reduce the sentence of a youth who committed a crime before age 25 after serving 15 years if the court finds they are not a danger to the community).

31

First, *Stovall* observed that "prisoners who receive parolable life sentences are given lower priority when it comes to educational and rehabilitative programming. Access to these programs is vital, especially for juvenile offenders, to enhance their growth and rehabilitative potential." *Id*. at 320-321. As discussed earlier, there is evidence to suggest that prisoners serving a lengthy term-of-years sentence are treated similarly to those serving a parolable life sentence in their priority for programming.[39] Moreover, the sentence here requires an offender to serve decades longer in prison before they can use any programming received to convince the parole board that they should be released from prison. See MCL 791.234(7)(a) (providing that a defendant sentenced to parolable life is first eligible for parole after serving 10 or 15 years in prison).

Second, *Stovall* reasoned that

the Legislature has made clear its intent that for juvenile first-degree-murder convictions, such a meaningful opportunity for release is generally available after 60 years unless the juvenile offender was afforded the procedural protection of a *Miller* hearing. It does not rationally follow that a meaningful opportunity for release for a juvenile convicted of second-degree murder could come after a longer period of incarceration than the maximum served by a juvenile convicted of first-degree murder. [*Id*. at 321.]

Similarly, a sentence of 50 to 75 years' imprisonment imposes a longer minimum sentence and maximum sentence than are generally available for a youthful offender convicted of the more serious offense of first-degree murder. See MCL 769.25(9); MCL 769.25a(4)(c).

Finally, *Stovall* concluded that

whether the Parole Board practically considers whether to grant parole to an offender serving a parolable life sentence is subject to the fluctuations of executive branch policies. An offender's meaningful opportunity to gain

---

[39] See note 32 of this opinion, citing PD 05.02.112, pp 4-5, ¶ T, p 7, ¶ JJ.

32

release is to be measured in terms of the offender's "demonstrated maturity and rehabilitation," not the whims of an executive branch policy directive instructing the Parole Board to forgo consideration of all offenders serving parolable life. *Miller*, 567 US at 479 (quotation marks and citation omitted). Without further statutory limits, . . . parolable life does not necessarily further the sentencing goal of rehabilitation. [*Stovall*, 510 Mich at 321-322 (citations omitted).]

As noted, an offender is highly unlikely to serve the entirety of a 75-year maximum sentence and be guaranteed release from prison in their lifetime. Thus, such an offender's opportunity for release is likely to forever be subject to the parole board's discretion and "the fluctuations of executive branch policies." *Id*. at 321.[40]

## E. RETROACTIVITY

In *People v Parks*, 510 Mich 225, 268; 987 NW2d 161 (2022), we held that mandatory LWOP sentences are cruel or unusual when applied to 18-year-olds. In *Taylor*, ___ Mich at ___; slip op at 2, we "extend[ed] *Parks* to individuals who were 19 or 20 years old at the time of the crime for which they were convicted." We then held that because *Parks* applies retroactively on collateral review, see *People v Poole*, ___ Mich ___, ___; ___ NW3d ___ (April 1, 2025) (Docket No. 166813); slip op at 1, so, too, would our opinion in *Taylor*. We explained that although the two cases at issue in *Taylor* were

---

[40] We further note that, while rehabilitation is the focus of this factor, we may also consider the extent to which a punishment serves other penological purposes, such as deterrence, retribution, and public safety. See *Lorentzen*, 387 Mich at 180; *Kardasz*, ___ Mich at ___; slip op at 41. While a lengthy criminal sentence for a severe crime *can* advance these purposes, for example, they do so to a significantly lesser extent for youthful offenders, as their known susceptibility to impulsive behavior significantly undermines any deterrent effect from increasing the length of possible punishment. See *Taylor*, ___ Mich at ___ n 30; slip op at 33 n 30. This is especially true in this case, where, unlike some first-degree-murder convictions, second-degree murder does not include premeditation and deliberation.

33

before the Court on direct review, the *Poole* retroactivity analysis applies with equal force to this decision. There is no logical justification for applying *Parks* retroactively to cases on collateral review and not doing the same for the holding reached in these cases involving 19- and 20-year-olds. Therefore, our decision in these cases applies retroactively to cases on collateral review. [*Taylor*, ___ Mich at ___; slip op at 37.]

The same logic applies here. *Stovall* and *Miller* both apply retroactively on collateral review.[41] Just as there was no logical justification for applying only *Parks* and not *Taylor* retroactively to cases on collateral review, there is equally no logical justification for applying only *Stovall* retroactively to cases on collateral review and not doing the same in this case. Accordingly, even though defendant proceeds on a motion for relief from judgment, because our holding applies retroactively on collateral review, defendant is entitled to relief. See *Poole*, ___ Mich at ___; slip op at 1-2.

## V. CONCLUSION

Largely for the reasons provided in *Stovall*, we conclude that every *Bullock* factor supports the conclusion that a sentence of 50 to 75 years' imprisonment for second-degree murder committed by a youthful offender is unconstitutionally excessive. Like a parolable life sentence, a sentence of 50 to 75 years' imprisonment exceeds what is presumptively imposed on a youthful offender for the more serious offense of first-degree murder, without the benefit of the procedural protections that are provided to a youthful offender convicted of first-degree murder. Such a sentence means that the initial review by the parole board does not occur until after a defendant has served 50 years in prison, after which an individual's opportunity for release is contingent on the parole board's discretion for the

---

[41] See *Stovall*, 510 Mich at 310-311; *Montgomery v Louisiana*, 577 US 190, 205, 208-209; 136 S Ct 718; 193 L Ed 2d 599 (2016).

remainder of their lifetime. Finally, this sentence is out of step with national trends regarding youth sentencing and with the types of sentences other jurisdictions typically impose on anyone convicted of second-degree murder, and it does not meaningfully advance the penological goal of rehabilitation. Accordingly, we agree with the Court of Appeals that defendant's sentence constitutes cruel or unusual punishment in violation of Const 1963, art 1, § 16.

We affirm the judgment of the Court of Appeals to the extent that it reverses the Wayne Circuit Court's order denying defendant's motion for relief from judgment, vacates defendant's sentence for second-degree murder, and remands to that court for resentencing. We vacate Part III of the Court of Appeals opinion to the extent it addresses whether defendant was procedurally barred by MCR 6.508(D)(2) from raising challenges to his sentence under *Milbourn* and *Boykin*, and we vacate Part VI of the Court of Appeals opinion, which addresses whether defendant was entitled to resentencing in light of those decisions. On remand, the trial court must impose a sentence that satisfies constitutional requirements as described in this opinion.

Kimberly A. Thomas
Megan K. Cavanagh
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Noah P. Hood

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                            No. 168205

JAMES GREGORY EADS,

      Defendant-Appellee.

_____

ZAHRA, J. (*dissenting*).

This case decides the constitutionality of a 50- to 75-year sentence imposed on a juvenile convicted of second-degree murder. In 1992, defendant was sentenced for the crime of second-degree murder after he shot and killed a 17-year-old for wearing a T-shirt identifying a rival gang. Thirty-four years later, this Court vacates defendant's sentence, condemning his 50- to 75-year sentence as unconstitutionally "cruel or unusual."[1] This holding comes as the latest volley in this Court's continued full-scale assault on juvenile and young-adult sentencing. As a result of this Court's tireless efforts to expand protections under our Michigan Constitution to violent predators, mandatory life-without-parole sentences for 18-year-olds sentenced for first-degree murder are unconstitutional;[2] the same goes for 19- and 20-year-olds;[3] both of those decisions apply retroactively to all

_____

[1] Const 1963, art 1, § 16.

[2] *People v Parks*, 510 Mich 225, 232; 987 NW2d 161 (2022).

[3] *People v Taylor*, ___ Mich ___, ___; ___ NW3d ___ (April 10, 2025) (Docket Nos. 166428 and 166654); slip op at 2.

previously incarcerated juveniles and young adults;[4] life-without-parole (LWOP) sentences for juveniles are still constitutional, but only barely, as this Court has decided that not only must prosecutors comply with the requirements announced by the Supreme Court of the United States in *Miller v Alabama*,[5] but they also bear the burden of proof to rebut the presumption that LWOP sentences are unconstitutional;[6] and parolable life sentences for juveniles and young adults convicted of second-degree murder are also unconstitutional.[7] Today, this Court declares for the first time, and contrary to its own precedent, that an individualized term-of-years sentence is unconstitutionally "cruel or unusual." In doing so, a majority of this Court holds that defendant's sentence is "grossly disproportionate" despite a determination by the Court of Appeals on direct appeal more than 30 years ago that defendant's sentence is proportionate.

I dissent from the majority opinion. Defendant's case is procedurally barred, and so is the claim the majority superimposes on defendant's motion for relief from judgment. On the merits, defendant's contention that his term-of-years sentence is unconstitutionally cruel or unusual fails. The majority opinion erroneously applies the multifactor test from

---

[4] *People v Poole*, ___ Mich ___, ___; ___ NW3d ___ (April 1, 2025) (Docket No. 166813); slip op at 1; *Taylor*, ___ Mich at ___; slip op at 37.

[5] *Miller v Alabama*, 567 US 460, 479-480; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

[6] *People v Taylor*, 510 Mich 112, 119-120; 987 NW2d 132 (2022).

[7] *People v Stovall*, 510 Mich 301, 307-308; 987 NW2d 85 (2022). While I accept the legitimacy of *Stovall* as precedent of this Court, I stand by my dissenting opinion in that case. In particular, to the extent that this case extends *Stovall*'s reasoning, I renew any relevant objections from that case, as further articulated in this dissenting opinion.

*People v Bullock*[8] to the facts of defendant's case, improperly comparing his sentence to the sentences at issue in *Stovall* and the sentences available for juvenile defendants convicted of first-degree murder. The majority opinion also employs the unworkable concept of a "de facto life sentence," creating a host of difficult and unanswerable questions that will undoubtedly form the basis on which this Court will, in future cases, continue its assault on juvenile and young-adult sentencing.

## I. FACTS AND PROCEDURAL HISTORY

In May 1992, Hal McDaniel and Ronnie Jaggers were driving in Detroit when they happened upon the 16-year-old defendant, James Gregory Eads, who was a member of the "Latin Counts" street gang. Jaggers offered defendant and his friend, Eddie Thornton, a ride, and they got in the backseat. McDaniel asked Jaggers to drive to an address on Burton Street so that he could talk to 17-year-old Eric Kincaid. When they got close to their destination, defendant noticed that Kincaid was wearing a T-shirt representing the rival street gang "Imperial Gangster Nation" (IGN). Defendant and Thornton started shouting, "Count Love!" at Kincaid from the backseat of the car. Defendant directed Jaggers to stop the car, and Jaggers pulled into a nearby alley. McDaniel got out and walked toward Kincaid. As McDaniel neared Kincaid, defendant drew a pistol and shot Kincaid five times, striking him in the chest and killing him. He also hit a bystander in the leg.

Defendant was charged with first-degree murder, MCL 750.316, and felony-firearm, MCL 750.227b. After a jury trial, defendant was convicted of the lesser included offense of second-degree murder, MCL 750.317, as well as felony-firearm. He was

[8] *People v Bullock*, 440 Mich 15, 33-34; 485 NW2d 866 (1992).

3

sentenced on November 4, 1992. The trial court departed from the guidelines minimum sentence range of 12 to 25 years' imprisonment, imposing a sentence of 50 to 75 years in prison for the second-degree murder conviction, plus two years in prison for the felony-firearm conviction. The trial court articulated the following rationale for the sentence on the record:

> I've been a judge for 17 years. I have never departed from the sentencing guidelines since they have been instituted, but I am going to depart from them in this case. If there was ever a crime that had no provocation at all to be committed, it's [defendant's]. I don't care if the man wore a T-shirt that said "Kill All Latin Counts" or "Kill James Gregory Eads". Shirts and words do not kill. He was driving by in a car. All he had to do was keep going. He didn't have to stop and do anything.

The trial court further stated:

> There's no provocation, there's no reason to have killed this person. Because they're wearing a shirt? How could you kill someone because they were wearing a shirt that is of a group that you dislike? I don't care what that shirt said. It could never be justification for killing anyone[.]

The trial court also noted reports from people who worked with defendant in the juvenile system, stating that defendant "has exhausted the facilities of any juvenile facility, and that in fact he organized a gang that was beating up other inmates, and that he's disruptive to other people, he doesn't attend school, and . . . the last place he was . . . he[] escaped, he truanted himself."

Defendant appealed as of right, challenging the sufficiency of the evidence supporting his second-degree murder conviction, arguing that he was denied his right to allocution at sentencing, and challenging his sentence as disproportionate under *People v*

*Milbourn*.[9]  The Court of Appeals affirmed defendant's convictions and sentence.[10]  This Court denied leave to appeal on September 19, 1995.[11]

With counsel, defendant filed the present motion for relief from judgment, his first, on January 19, 2021.  The trial court denied defendant's motion on May 6, 2021.  The Court of Appeals denied defendant's application for leave to appeal.[12]  Defendant filed an application for leave to appeal in this Court.  While that application was pending, this Court issued opinions in *Stovall*[13] and *People v Boykin*.[14]  This Court subsequently remanded this case to the Court of Appeals as on leave granted, directing the Court of Appeals to consider "whether the defendant is entitled to relief under *People v Boykin*, 510 Mich 171 (2022), or *People v Stovall*, 510 Mich 301 (2022)."[15]

On remand, the Court of Appeals reversed the trial court's order denying defendant's motion for relief from judgment, vacated defendant's sentence, and remanded the case to the trial court for resentencing.[16]  The Court of Appeals held that defendant's

---

[9] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

[10] *People v Eads*, unpublished per curiam opinion of the Court of Appeals, issued November 9, 1994 (Docket No. 160735).

[11] *People v Eads*, 450 Mich 865 (1995).

[12] *People v Eads*, unpublished order of the Court of Appeals, entered July 19, 2021 (Docket No. 357332).

[13] *Stovall*, 510 Mich 301.

[14] *People v Boykin*, 510 Mich 171; 987 NW2d 58 (2022).

[15] *People v Eads*, 512 Mich 918, 918 (2023).

[16] *People v Eads*, ___ Mich App ___, ___; ___ NW3d ___ (January 16, 2025) (Docket No. 357332); slip op at 15.

5

sentence violated the Michigan Constitution's prohibition against cruel or unusual punishment.[17]  The Court of Appeals also held that defendant's sentence was disproportionate in light of the sentencing court's failure to consider defendant's youth as a mitigating factor.[18]  Judge MURRAY dissented from the Court of Appeals opinion, arguing that defendant's sentence was proportionate under *Milbourn* and *Boykin* and that it therefore could not be cruel or unusual punishment under the Michigan Constitution.[19]

The prosecution filed an application for leave to appeal in this Court.  We granted that application, directing the parties to address "whether the Court of Appeals erred by holding that: (1) the defendant is entitled to relief under *People v Stovall*, 510 Mich 301 (2022); and (2) the defendant is entitled to relief under *People v Boykin*, 510 Mich 171 (2022)."[20]

## II.  ANALYSIS

### A.  THIS CASE IS PROCEDURALLY BARRED

As a preliminary matter, this Court has in recent years been extremely cavalier in granting relief under the relief-from-judgment court rule.  I recently discussed the importance of the finality of judgments:

> A lack of finality harms the public's interest in the respect and value of criminal dispositions, but it especially harms victims.  " 'Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out.  To unsettle these expectations is to inflict a profound

---

[17] *Id*. at ___; slip op at 8, citing Const 1963, art 1, § 16.

[18] *Id*. at ___; slip op at 15.

[19] *Id*. at ___ (MURRAY, P.J., dissenting); slip op at 2-3.

[20] *People v Eads*, ___ Mich ___, ___; 25 NW3d 118, 118 (2025).

6

injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike.' " Finally, uprooting established court judgments and revisiting cases long settled as final produces substantial harm to defendants. "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved."

Accordingly, advancing the principle of finality and effective administration of justice, courts have the authority to decline relief for issues that were previously raised and resolved, and for issues that should have been raised previously but were not. That includes the law-of-the-case doctrine, which provides that "a ruling by an appellate court with regard to a particular issue binds the appellate court and all lower tribunals with respect to that issue . . . ." The doctrine also extends in similar ways to habeas proceedings, collateral proceedings, motions for new trial, motions for relief from judgment, motions for reconsideration, and successive cases presenting the same issue, to name a few.[21]

These considerations apply with equal force to sentencing decisions and constitute a presumption against granting relief in the present case. In granting defendant relief, the Court today fails to acknowledge the restrictive limits placed on motions for relief from judgment and undermines the interest in certainty and finality in criminal sentencing.

On the facts of the present case, I conclude that relief to defendant is precluded by MCR 6.508, which specifies that a court may not grant relief on a motion for relief from judgment if the motion "alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding . . . ."[22] If the claims were not raised in a prior proceeding, the court still may not grant relief if the motion "alleges grounds for relief,

---

[21] *People v Jackson*, 513 Mich 876, 881-884 (2023) (Zahra, J., dissenting) (citations omitted).

[22] MCR 6.508(D)(2).

7

other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter . . . ."[23] As an exception, the court may grant relief if the defendant can demonstrate "good cause for failure to raise such grounds on appeal or in the prior motion"[24] as well as "actual prejudice from the alleged irregularities that support the claim for relief."[25] One such condition that qualifies as "actual prejudice" is if, "in the case of a challenge to the sentence, the sentence is invalid."[26] We have held that one way a sentence can be invalid is "when it is based upon constitutionally impermissible grounds."[27]

Defendant's motion for relief from judgment alleged two grounds for relief. First, defendant argued that MCL 750.317, MCL 769.25, and MCL 769.25a violate the Equal Protection Clauses of the United States and Michigan Constitutions, both facially and as applied, because they treat him more harshly than a 16-year-old who committed the same offense and was convicted as charged under the first-degree murder statute, MCL 750.316. Second, defendant argued that his sentence for second-degree murder violates the Eighth Amendment's Cruel and Unusual Punishment Clause because the sentencing court failed to conduct an individualized sentencing and failed to consider the mitigating factors of

---

[23] MCR 6.508(D)(3).

[24] MCR 6.508(D)(3)(a).

[25] MCR 6.508(D)(3)(b).

[26] MCR 6.508(D)(3)(b)(iv).

[27] *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997).

youth in accordance with *Miller*. Defendant made the same arguments in the Court of Appeals and again in this Court.

Notably absent from defendant's motion for relief from judgment or subsequent filings in the Court of Appeals was any argument that his term-of-years sentence is categorically unconstitutional under any constitution, including under the Cruel or Unusual Punishment Clause of the Michigan Constitution. It was only after this Court remanded the case to the Court of Appeals as on leave granted with instructions to consider the case in light of *Boykin* and *Stovall* that the defendant first made such an argument. It is significant that the majority opinion does not even bother to analyze whether the original arguments in defendant's motion survive MCR 6.508. Instead, the majority elects to analyze the viability of its own argument—the one imposed on the Court of Appeals in the remand order from this Court.

Setting aside this Court's activist and unprecedented rewriting of defendant's motion, the case still fails procedurally. While this Court undoubtedly has power to consider additional issues it deems appropriate,[28] this Court lacks the power to consider a motion for relief from judgment that is prohibited by the court rules. The argument that defendant's sentence is cruel or unusual under the Michigan Constitution is procedurally barred by MCR 6.508 because defendant cannot establish good cause for failing to raise that argument in a prior proceeding. The majority opinion states that defendant's "direct appeal was exhausted in 1995, long before *Miller*, *Stovall*, and other retroactive changes in constitutional law regarding youth sentencing were decided." All true. But the majority

---

[28] See MCR 7.316(A)(3) (allowing the Court to "permit the reasons or grounds of appeal to be amended or new grounds to be added").

9

opinion holds that this qualifies as "good cause" for failing to raise the challenge on direct appeal because the "legal basis for [the] claim was not then reasonably available to [defendant's] counsel."[29] This is not true. The Cruel or Unusual Punishment Clause of the Michigan Constitution and the Cruel and Unusual Punishment Clause of the federal Constitution were both in force and available to defendant at the time of his direct appeal.

Of greater significance, neither *Miller* nor *Stovall* has any bearing on defendant's case. *Miller* held that sentences of life imprisonment without the possibility of parole imposed on juveniles convicted of first-degree murder violate the Cruel and Unusual Punishment Clause of the federal Constitution. *Stovall* held that parolable life sentences for juveniles and young adults convicted of second-degree murder violate the Cruel or Unusual Punishment Clause of the Michigan Constitution. Neither case addressed the constitutionality of individualized term-of-years sentences for juveniles convicted of second-degree murder. As a result, no retroactive change in the law justifies defendant's failure to raise a challenge under the Michigan Constitution's Cruel or Unusual Punishment Clause in his direct appeal. The claim is therefore barred by MCR 6.508(D)(3)(a). *Stovall*[30] is deemed a retroactive change in the law only because the majority opinion today elects to extend its reasoning. Otherwise, defendant would not clear the procedural hurdle

---

[29] Citing *People v Reed*, 449 Mich 375, 384-385 & n 8; 535 NW2d 496 (1995) (opinion by BOYLE, J.).

[30] The majority knows that *Miller* does not even remotely reach the facts of defendant's case. The real retroactive change in the law relied on here is *Stovall*. The majority opinion invokes *Miller* only in an attempt to borrow much-needed credibility for its tattered and arbitrary sentencing jurisprudence.

10

of MCR 6.508.[31] In short, the Court abandons an evenhanded administration of our court rules to achieve a result-driven application of procedure. Such action injects uncertainty into our criminal jurisprudence and undermines longstanding principles of finality.

## B. THE MAJORITY OPINION IMPROPERLY CONDUCTS CONSTITUTIONAL REVIEW OF AN INDETERMINATE, INDIVIDUALIZED SENTENCE

Barreling through the procedural thicket, the majority opinion turns to an analysis of defendant's (read: "this Court's") claim of cruel or unusual punishment under the Michigan Constitution. To evaluate this claim, the majority opinion applies the four factors formulated in *People v Lorentzen*[32] and *Bullock* for analyzing whether statutory sentences are proportionate under the Cruel or Unusual Punishment Clause of the Michigan Constitution,[33] which have come to be referred to collectively as the *Bullock* factors:

---

[31] The majority contends that "new caselaw interpreting a constitutional provision can provide 'good cause' for failure to raise a claim in a previous proceeding." While I agree with this point, I agree with Justice VIVIANO's statement in *Stovall* that "[r]eliance on a clearly inapplicable holding . . . is not a true basis or a foundation; rather, it is an illusory anchor point." *Stovall*, 510 Mich at 364-365 (VIVIANO, J., dissenting). His procedural attack applies with equal force in the present case: "The majority's interpretation of MCR 6.502(G)(2) elevates form over substance, allowing a defendant to satisfy the procedural requirements simply by citing a case with retroactive effect in a motion for relief from judgment, regardless of whether the caselaw relied on actually entitles the defendant to any relief." *Id*. at 365. He continued, "[T]he majority has imposed no discernable limitation on how tangential a case may be to the relevant new rule or how great of an extension would be necessary in order for a defendant to be entitled to relief." *Id*. at 367.

[32] *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972).

[33] For the reasons stated in my dissent in *Stovall*, 510 Mich at 338 n 24, 343 n 25 (ZAHRA, J., dissenting), I would revisit our caselaw interpreting Const 1963, art 1, § 16— specifically, whether Article 1, § 16 provides greater protection than the Eighth Amendment of the United States Constitution and whether Article 1, § 16 contains a proportionality guarantee.

11

> Michigan courts, in evaluating the proportionality of sentences under the "cruel or unusual punishment" clause, are required to consider: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically rooted in Michigan's legal traditions[.][34]

In walking through these factors, the majority opinion relies heavily on the perceived similarity between this case and *Stovall*, extending the *Bullock* analysis in *Stovall* to determine the holding in this case. The majority opinion concludes that under each factor, the analysis applies with equal force to the sentence at issue in this case as it did to the parolable life sentences at issue in *Stovall*. However, the extension of *Stovall* to the present case suffers from several fatal flaws.

The first issue arises from the application of the constitutional cruel-or-unusual-punishment test to discretionary term-of-years sentences. Normally, discretionary term-of-years sentences are subject to proportionality review under *Milbourn*, which "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."[35] As the majority opinion notes, this analysis asks whether a given sentence is consistent with the principle of proportionality inherent in the Legislature's grant of discretion. On the other hand, Michigan courts have, until now, typically reviewed only nondiscretionary sentences under the Cruel or Unusual Punishment Clause of Const 1963, art 1, § 16. These two analyses have been applied to their respective kinds of sentences with remarkable consistency—this

---

[34] *Parks*, 510 Mich at 242, citing *Bullock*, 440 Mich at 33-34 (quotation marks and citation omitted).

[35] *Milbourn*, 435 Mich at 636.

Court has exclusively applied the *Bullock* factors to statutorily prescribed sentences.[36] In fact, I am unable to find a Michigan case applying the *Bullock* test to a term-of-years sentence.

Not to be deterred, the majority chooses to break new ground in this case by applying the *Bullock* factors to an individualized, discretionary term-of-years sentence. The majority opinion urges that some sentences may be proportionate within the statutory framework as enacted by the Legislature and yet still be categorically unconstitutional. In other words, a sentence could be proportionate under *Milbourn* and yet still be categorically cruel or unusual under the Michigan Constitution. The majority opinion then concludes, "It would be inappropriate to interpret a doctrine premised on legislative intent as cutting off an independent constitutional analysis that, by its nature, serves as a limitation on the Legislature's authority."

The majority opinion tells a neat story, but the compatibility of these two tests breaks down before we even reach the *Bullock* factors. The majority opinion's proposed overlapping of the two tests runs into problems even on the mere suggestion of application to the specific statute under consideration here. The statute at issue in this case is MCL 750.317, which states, "All other kinds of murder shall be murder of the second degree,

---

[36] See *Lorentzen*, 387 Mich at 170-171 (considering a mandatory minimum sentence for sale of narcotics); *Bullock*, 440 Mich at 21 (considering a mandatory LWOP sentence for knowing possession of a quantity of cocaine); *Parks*, 510 Mich at 232 (considering a mandatory LWOP sentence for first-degree murder); *Taylor*, ___ Mich at ___; slip op at 2 (same as *Parks*); *People v Lymon*, 515 Mich 145, 151-152; 29 NW3d 58 (2024) (considering mandatory sex-offender registration for non-sexual offenders); *People v Kardasz*, ___ Mich ___, ___; ___ NW3d ___ (December 19, 2025) (Docket No. 165008); slip op at 1-2 (considering mandatory sex-offender registration for sexual offenders).

13

and shall be punished by imprisonment in the state prison *for life, or any term of years*, in the discretion of the court trying the same."[37] Thus, the statute authorizes the trial court to impose whatever sentence it deems appropriate in its discretion. To borrow the majority opinion's language, there is no "legislative intent for proportionality in sentencing" in the Legislature's grant of "discretion to impose a sentence within a particular range" because there is *no particular range imposed*. The only nonconstitutional proportionality principle that applies is *Milbourn*'s general directive "requir[ing] sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."[38] As the majority would have it, courts reviewing this statute must ask both whether the sentence imposed is nonconstitutionally disproportionate under *Milbourn and* whether the sentence is constitutionally disproportionate under the Cruel or Unusual Punishment Clause. But with regard to this specific statute, those two analyses collapse into one. While analysis under the Cruel or Unusual Punishment Clause involves a step-by-step application of the *Bullock* factors, the thrust of the inquiry is to ask "whether the punishment concededly chosen or authorized by the Legislature is so grossly disproportionate as to be unconstitutionally 'cruel or unusual.' "[39] We have summarized

---

[37] Emphasis added. Oddly, although the majority opinion purports to be applying the categorical constitutional test as a "*check* on the Legislature's authority to authorize punishment," the majority opinion never mentions either the Legislature or the relevant statute in its holding "that defendant's sentence of 50 to 75 years' imprisonment for a second-degree murder committed while he was a youth constitutes cruel or unusual punishment," reinforcing the conclusion that this case is nothing more than a *Milbourn* do-over facilitated by a change in composition of the Court.

[38] *Milbourn*, 435 Mich at 636.

[39] *Bullock*, 440 Mich at 34 n 17.

14

the constitutional protections as requiring "that criminal sentences be proportional to the circumstances of the offense and of the offender such that excessive imprisonment is prohibited."[40] Thus, under the majority's view, analysis of a sentence under the statute at issue in this case involves asking both whether the sentence is "proportionate to the seriousness of the circumstances surrounding the offense and the offender"[41] and whether the sentence is "proportional to the circumstances of the offense and of the offender."[42] In short, the two tests are the same, and only a judiciary blinded by the sweat of an ideological effort to legislatively reform juvenile sentencing through the power of judicial fiat could think otherwise.

Defendant already asserted a proportionality claim on direct review over 30 years ago, that issue was decided against him, and this Court denied leave to appeal. Today, this Court spins an elaborate tale to explain how its actions in this case are procedurally and substantively justified. In reality, the majority seeks to undo the denial of leave to appeal properly entered by this Court 30 years ago. In short, the Court gives defendant a *Milbourn* do-over.[43] In doing so, the majority opinion puts itself in the curious and unreconcilable

---

[40] *Taylor*, ___ Mich at ___; slip op at 8.

[41] *Milbourn*, 435 Mich at 636.

[42] *Taylor*, ___ Mich at ___; slip op at 8.

[43] The majority opinion admits that there is "certainly overlap" between the *Milbourn* and *Bullock* inquiries, but it nonetheless concludes that defendant raised a distinct ground for relief because the two tests have "different functions, sources, and frameworks." As I note above, however, under the circumstances of this case, the function of the inquiries is identical. The "sources" and "frameworks" for the two tests are irrelevant when determining whether the question in this case was already answered on direct review.

15

position of declaring that a sentence is at once proportionate and also grossly disproportionate.

## C. THE COMPARISON TO FIRST-DEGREE-MURDER SENTENCES IS INAPT

The second flaw with the majority opinion's analogy to *Stovall* comes in its analysis of *Bullock* factors one and two, and specifically its comparison of the sentence at issue in this case to the sentences imposed on juveniles for first-degree murder. The majority opinion borrows from *Stovall*'s comparison of parolable life sentences (which were imposed for second-degree murder) to the sentences imposed on juveniles for first-degree murder. *Stovall* reasoned that a parolable life sentence is more severe than the sentences available for juveniles who are convicted of first-degree murder and not sentenced to LWOP because the term-of-years sentences imposed on juveniles who commit first-degree murder are 25 to 40 years at minimum and 60 years at maximum, which is less burdensome than a parolable life sentence.[44] The majority opinion summarizes *Stovall* as concluding that "a parolable life sentence is not an option for a juvenile convicted of first-degree murder who, after a *Miller* hearing, is not sentenced to LWOP."[45] And the majority points

---

[44] *Stovall*, 510 Mich at 316-317 (opinion of the Court).

[45] I argued against this in *Stovall*:

> The inference from the majority opinion's juxtaposition of parolable life sentences and term-of-years sentences under MCL 769.25 and MCL 769.25a is that, had the Legislature simply chosen to change all nonparolable life sentences for juvenile homicide offenders to parolable life sentences, such a scheme would be constitutionally permissible. But, because the Legislature decided to retain life without parole as a permissible sentence for some Michigan juvenile homicide offenders and permit term-of-years sentences for others, the majority opinion concludes that parolable life sentences are unconstitutional for *all* juvenile homicide offenders. Put another way, the majority opinion concludes that parolable life for juvenile homicide

out that *Stovall* held that a parolable life sentence " 'is often *more* severe than the minimum sentences now given to most juveniles who commit *first-degree* murder: 25 to 40 years.' "[46] The majority opinion extrapolates this relationship to the present case: a 50- to 75-year sentence "provides minimum and maximum sentences that are more severe than the minimum and maximum term-of-years sentences that are presumptively imposed on a youth convicted of the more serious offense of first-degree murder—and without the procedural safeguards provided to such offenders." From this, the majority opinion concludes that "a sentence of 50 to 75 years' imprisonment is harsher than the permissible term-of-years sentence for a youth convicted of the more serious offense of first-degree murder."

Its conclusion is not so obvious. As noted above, defendant received an individualized, discretionary sentence that took into account his unique characteristics and the circumstances of his offense. Accordingly, the two sentencing regimes (term-of-years sentences for second-degree murder versus the sentencing regime in MCL 769.25 for first-degree murder) are incommensurate, which is a problem that pervades every aspect of this

---

offenders is unconstitutional because the Legislature excludes parolable lifers like defendant from its chosen *Miller* remedy—even though those offenders do not fall within the purview of *Miller*. This is truly a remarkable conclusion, as the majority opinion uses the Legislature's chosen *Miller* remedy as a justification for finding parolable life sentences constitutionally disproportionate. This is nothing short of second-guessing the Legislature's policy decisions, which we may not do. [*Stovall*, 510 Mich at 353-354 (ZAHRA, J., dissenting) (citation omitted).]

The same reasoning applies with equal force to the facts of the present case.

[46] Quoting *Stovall*, 510 Mich at 316 (opinion of the Court) (emphasis in *Stovall*).

17

case. What is more, the quoted language from the majority opinion above displays an attempt to sidestep the obvious fact that juveniles convicted of first-degree murder can still be sentenced to LWOP.[47] If we accept the premise that the two kinds of sentences are comparable, we cannot ignore this reality. And once we acknowledge that reality, the correct answer under *Bullock* factors one and two becomes clear: a term-of-years sentence is necessarily less severe than a sentence of LWOP.

And finally, even if I were to concede that it makes a meaningful difference that some juvenile first-degree-murder offenders are sentenced to term-of-years sentences, it does not therefore follow that defendant's sentence is unconstitutionally cruel or unusual simply because it is longer than those term-of-years sentences. Determining whether a long term-of-years sentence is more severe than one imposed under a bifurcated sentencing regime that assigns the indisputably harsher penalty of LWOP in some circumstances and nearly comparable term-of-years sentences in other circumstances is an impossible task. The fact that a juvenile sentenced for first-degree murder may be subject to a lesser *individualized* term-of-years sentence than a juvenile convicted of second-degree murder does not render the latter sentence unconstitutionally cruel or unusual. This Court has never policed the overlap of discretionary sentences by such a measure.

Ultimately, the only relevant comparison is that juveniles may be punished for first-degree murder with LWOP, while juveniles convicted of second-degree murder may not be. Defendant's 50- to 75-year sentence is therefore proportionate to the offense under *Bullock* factors one and two. Second-degree murder, as the second most serious crime in

[47] See MCL 769.25(2).

18

this state, deserves a punishment equal to the gravity of the offense. A long term-of-years sentence fits the crime because it is less severe than a sentence of LWOP but serious enough to accomplish the state's penological goals. This sentence is constitutionally proportionate.

The majority opinion also compares defendant's parole eligibility to parole eligibility for juvenile defendants sentenced to parolable life sentences considered in *Stovall*. Defendant will not be eligible for parole until long after defendants sentenced to parolable life sentences are eligible for parole. Additionally, the majority opinion reports that "there is evidence to suggest that prisoners serving a lengthy term-of-years sentence are treated similarly to those serving a parolable life sentence in their priority for programming." The majority opinion also finds it significant that "such a sentence is likely to render an individual's opportunity for release contingent on the parole board's discretion for that individual's entire lifetime."

The majority opinion's reasoning here misses the mark. Again, defendant's date of parole eligibility was determined as part of an individualized sentencing that considered the specific characteristics of defendant and the crime he committed. Accordingly, it is improper to compare his parole eligibility to that of defendants sentenced under mandatory sentencing regimes. Even if such a comparison were proper, however, defendant's sentence is still constitutional. Juveniles sentenced for first-degree murder can be sentenced to LWOP, which is indisputably a harsher sentence than defendant's sentence for the simple reason that defendants serving LWOP sentences are, as the name states, never eligible for parole.

19

## D. MEASURING SENTENCES BY A STANDARD OF "DE FACTO LIFE" IS UNWORKABLE

In analyzing defendant's sentence—still under *Bullock* factors one and two—the majority opinion suggests that defendant's sentence can be considered a life sentence because it is so long that it qualifies as a "de facto" life sentence. The majority opinion declines to offer a concrete definition of a de facto life sentence: "It is unnecessary to definitively draw a line in this case as to what we consider to be a de facto life sentence for the purposes of Const 1963, art 1, § 16." Nevertheless, after today's decision, defining a de facto life sentence is vitally important for sentencing jurisprudence in this state. Yet, no matter how it is defined, the de facto standard for life sentences is an unworkable standard that will induce a chaotic flurry of litigation as courts attempt to reconcile it with existing statutes and caselaw.

The standard is unworkable because it is entirely relative to the characteristics of each specific offender. Ordinarily, a life sentence means a life sentence: the offender remains incarcerated until death (or parole, if serving a parolable life sentence). A de facto life sentence, however, is actually a term-of-years sentence. What makes it a de facto life sentence is that it exceeds the *life expectancy*—not the actual life—of the offender. Measuring life expectancy presents its own set of problems.[48] More importantly, even if we assume the life expectancy of prison inmates is an identifiable constant, the age of each

---

[48] For example, which source should courts rely on for determining life expectancy? Who bears the burden of proof for demonstrating life expectancy? Which characteristics should courts consider in calculating life expectancy? Gender only? Or also medical history, diet, level of exercise, mental health diagnoses, etc.?

offender is different.  That means that a set term of years will consume different portions of every offender's expected remaining lifetime.

This will create numerous difficulties in application.  For example, if we use the data report on inmate life expectancy cited by the Court of Appeals below, inmates have a life expectancy of about 64 years.[49]  Under the de facto theory of life sentences, a court could sentence a 16-year-old defendant to a 47-year prison term without imposing a de facto life sentence.  For an 18-year-old, however, the same sentence would qualify as a de facto life sentence.  The difficulties multiply if we apply the concept of de facto life to adults convicted of offenses other than first- and second-degree murder.  What are courts to do when a 63-year-old offender is convicted of an offense with a mandatory term-of-years sentence?  Such a sentence would automatically qualify as a de facto life sentence and would presumably be constitutionally cruel or unusual because it imposes a harsher penalty for a lesser offense.  Even more confounding, consider a 65-year-old offender who commits *any* offense punishable with imprisonment.  Can a court constitutionally impose a sentence?  Or take the present defendant, who argued before this Court that his life expectancy is 50.6 years.[50]  And yet, according to the Michigan Department of Corrections, at the time of the writing of this opinion, defendant is 50.74 years old.[51]  Does that mean his sentence should not be called a de facto life sentence but instead should be called an

---

[49] *Eads*, ___ Mich App at ___; slip op at 9 (citation omitted).

[50] Citing LaBelle, *Michigan Life Expectancy Data for Youth Serving Natural Life Sentences* (2013), p 2, available at <https://perma.cc/9PSY-3B6Q>.

[51] See generally Michigan Department of Corrections, *Offender Tracking Information System* <https://mdocweb.state.mi.us/OTIS2/Profile> (accessed July 18, 2026).

21

*actual* life sentence? Is the case moot now that defendant's life expectancy has elapsed? In summary, the concept of a de facto life sentence rewards offenders for being old and punishes offenders for being young, which is seemingly the opposite of the trend in this Court's sentencing jurisprudence.

The majority opinion also finds it significant that a 50-year minimum sentence creates a "good possibility that a youthful offender will not live long enough to even be *eligible* for parole." This only transposes the problem. Courts must still consider the age of the individual defendant relative to the average inmate life expectancy when imposing a sentence. It makes no difference whether the relevant "end date" for purposes of a de facto life sentence is parole eligibility, minimum sentence length, or maximum sentence length. The problem remains.[52]

This Court's opinion in *People v Lemons* runs contrary to the majority opinion's characterization of defendant's sentence as a de facto life sentence. Specifically, this Court

---

[52] The majority opinion feigns innocence with respect to these problems by responding that the inquiry into whether a sentence qualifies as a de facto life sentence is "unavoidable." In fact, quite the opposite is true. Nothing about the majority opinion's analysis or conclusion is compelled. As I illustrate in my dissent, the majority bends over backwards to reach today's result. Its assertion that it has no other option than to employ the unserviceable and disruptive "de facto life" standard rings hollow.

With respect to the inevitable litigation over the meaning of "de facto life," the majority opinion responds that its "holding in this case is that a sentence of 50 to 75 years' imprisonment for a *youthful* offender convicted of second-degree murder is cruel or unusual punishment for many of the same reasons that *Stovall* concluded that a parolable life sentence for such an offender is cruel or unusual punishment." This is nothing less than the majority burying its head in the sand. I fail to see how emphasizing that today's *holding* is technically limited to a specific sentence length should provide any reassurance to the people of Michigan that the *reasoning* of today's opinion will not be extended to work a calamitous transformation of sentencing statutes and jurisprudence. The majority opinion simply chooses to ignore the problem.

held in *Lemons* that "where a sentence falls within the permissible range of sentences . . . [for an offense punishable by a sentence of] life or . . . any term of years, and [where the sentence] is indeterminate, . . . the sentence is lawful as long as it meets the requirements of proportionality under *Milbourn*."[53] Additionally, *Lemons* rejected the idea that a sentence must provide the defendant a reasonable prospect of release in his lifetime. The majority opinion acknowledges *Lemons*'s holding but chooses to double down on the concept of de facto life sentences.

### E.  COMPARISON TO SENTENCES IN OTHER JURISDICTIONS

The majority engages in an analysis of the third *Bullock* factor, which requires courts to consider "sentences imposed in other jurisdictions for the same offense[.]"[54] However, the majority opinion again runs into the incommensurability problem ubiquitous in this case. The majority opinion compares defendant's sentence to the sentences imposed on juveniles for second-degree murder in other states, but it is not clear how the majority opinion is able to do this. At the risk of repeating myself ad nauseum, defendant received an individualized, discretionary sentence tailored to his unique characteristics and the circumstances of his crime. No other defendant—in this jurisdiction or elsewhere—both has the same set of characteristics and committed the same crime under the same circumstances. Consequently, reviewing courts cannot compare individualized sentences.

---

[53] *People v Lemons*, 454 Mich 234, 258; 562 NW2d 447 (1997) (quotation marks and citation omitted).

[54] *Parks*, 510 Mich at 242, citing *Bullock*, 440 Mich at 33-34 (citation omitted).

This compels the conclusion that the third *Bullock* factor is inapplicable to term-of-years sentences. Judge MURRAY concluded as much in his dissent in the Court of Appeals below, rightly noting that the *Bullock* test "is geared to testing the constitutionality of a specific, mandated statutory punishment, as it requires the reviewing court to compare the sentence mandated by the Legislature for the crime at issue with other statutory penalties in this state *and across the nation*."[55] Judge MURRAY continued, "[W]hen a sentence is individualized, that comparison cannot be made by simply examining what other statutes in this or other states require, as an individualized term-of-years sentence (particularly when not subject to a maximum cap) is based upon the defendant's background, the facts and circumstances of the crime, and other relevant criteria considered in tailoring a proportionate sentence."[56] The majority opinion fails to explain the ill fit of this test, and particularly the third prong, for individualized sentences.[57]

### F. THE RAMIFICATIONS OF TODAY'S DECISION

In addition to the inapt comparison to *Stovall* and first-degree-murder sentences, the ill fit of the *Bullock* test, the unworkability of the de facto standard for measuring life

---

[55] *Eads*, ___ Mich App at ___ (MURRAY, P.J., dissenting); slip op at 2 (emphasis added).

[56] *Id*. at ___; slip op at 2-3.

[57] The majority opinion analogizes to *Stovall*, where this Court analyzed parolable life sentences, which the majority notes are not statutorily mandated. Because those sentences are discretionary, the majority suggests that the *Bullock* factors are equally applicable to term-of-years sentences. However, the majority opinion works against itself here. Where the fit between the *Bullock* factors and discretionary parolable life sentences was poor, the fit with individualized term-of-years sentences is even worse. What is more, at least a parolable life sentence is a discrete category of sentence, while in this case, the majority opinion singles out a seemingly arbitrary sentence length for categorical prohibition.

sentences, and the dictates of precedent, the majority opinion also creates several other issues that it does not address, both theoretical and practical. First, I find nothing in the majority opinion that would prevent non-juvenile and non-young-adult offenders from bringing constitutional proportionality claims even after (and potentially decades after) their sentences have been affirmed on direct appeal under nonconstitutional *Milbourn* proportionality review. I also see nothing in the majority opinion to discourage expansion of this new claim beyond offenders convicted of second-degree murder. Creative litigants will argue that today's decision applying the Cruel or Unusual Punishment Clause for the first time to a term-of-years sentence constitutes a retroactive change in the law sufficient to overcome the procedural bars to collateral review. As noted above, they may now have credible arguments based on the characterization of their sentences as de facto life sentences. Regardless of the merits of these claims, however, the majority opinion functions as an invitation for such defendants to make their case, further eroding principles of finality that have been the bedrock of our criminal law jurisprudence.

Second, where is the upper limit for sentences imposed on juvenile and young-adult offenders convicted of second-degree murder? In other words, how long is too long? After today's decision, courts, counsel, and litigants have only a single data point from which to proceed in answering that question: 50- to 75-year sentences are cruel or unusual. Presumably, juvenile and young-adult offenders convicted of second-degree murder cannot constitutionally be subject to sentences *longer* than 50 to 75 years. The real question, though, is how much *lower* than a 50- to 75-year sentence does the Michigan Constitution reach? Relatedly, should we measure the constitutionality of the sentence by the minimum or the maximum sentence, and whichever of those we choose, should we compare it to the

25

upper or lower end of the statutory minimum for term-of-years sentences imposed on juveniles for first-degree murder, or should we compare it to the lowest allowable maximum sentence? Inevitably, the lower courts will reach differing conclusions regarding the reach of the majority opinion's holding, thereby further eroding our criminal law jurisprudence. At some point, this Court will be forced to draw a hard line: X years is too many, but Y is permissible. Such a definitive line will almost certainly be arbitrary. Until that holding comes, lower courts will be operating in the dark.

## III. CONCLUSION

Defendant was convicted of murder and sentenced to a term-of-years sentence. On direct appeal, defendant's sentence was affirmed as proportionate under *Milbourn*. In the current motion for relief from judgment, defendant argued that his sentence violates the principles of equal protection and that the trial court failed to consider the mitigating characteristics of youth. This Court rewrites defendant's motion to include a claim that the sentence imposed is categorically cruel or unusual as applied to him and ignores the procedural bars traditionally associated with and applied to a motion for relief from judgment. The majority opinion rests its holding on *Stovall*'s shaky reasoning, using inapt comparisons to parolable life sentences and the term-of-years sentences available for juveniles convicted of first-degree murder. It also invokes the dubious concept of de facto life sentences. Considered as a whole, the majority opinion's results-oriented legal analysis betrays the legislative intent behind this most recent chapter in this Court's campaign to reform juvenile and young-adult sentencing. For all of the above reasons, I dissent.

Brian K. Zahra

26